# EXHIBIT  A

ALLAN L. ALEXANDER
ARTHUR O. ARMSTRONG
DIANA CARTER
J. GUNNAR ERICKSON
KENNETH A. GOLOMAN
GEORGE T. HAYUM
BARRY L. HIRSCH
ALAN J. LEVINE
ANTHONY A. LEWINTER
ROCHELLE M. LINDSEY
MICHAEL A. MILLER
MORTON M. ROSENFELD
RICHARD D. ROSMAN
DAVID G. STANLEY
BARRY W. TYERMAN
ROBERT S. WALLERSTEIN
ALAN S. WERTHEIMER

LAW OFFICES

# ARMSTRONG & HIRSCH

A PROFESSIONAL CORPORATION

1888 CENTURY PARK EAST

SUITE 1888

LOS ANGELES, CALIFORNIA 90067

March 18, 1985

TELEPHONE (213) 553-0305
TELECOPIER (213) 553-6036
CABLE AHBLAW
TWX 910 490-2102

OF COUNSEL
RONALD J. BASS
GERALDINE S. HEMMERLING

Mr. Irving Paul Lazar
211 South Beverly Drive
Suite 110
Beverly Hills, California 90212

Re:  "Lonesome Dove" By  Larry McMurtry

Dear Irving:

The following (which supersedes my letter to you of
February 25, 1985) shall confirm the agreement reached between
you, on behalf of Larry McMurtry ("Author"), and me on on
behalf of Motown Productions ("Purchaser") with respect to the
above-referenced novel ("Property") which will be published
later this year.

1.  (a)  Upon Purchaser's receipt of a copy of this
letter agreement executed by Author, and executed copies of
the documents referred to in Paragraph 1 (b) hereof, Purchaser
shall pay Author the sum of Fifty Thousand Dollars ($50,000)
and shall thereupon acquire all of the motion picture, televi-
sion, remake and sequel, merchandising, commercial tie-up and
other allied rights of every kind and nature exclusively
throughout the world in perpetuity (subject to the rights
reserved by Author specified in Paragraph 3 below) in and to
the Property, provided that all rights herein granted shall
revert to Author if the applicable sum described in Paragraph
2(a) below is not paid to Author on or before twenty-four (24)
months following the date of execution hereof.

(b)  Author shall execute, or cause to be executed, a
Short Form Assignment in the form of Exhibit "A" attached
hereto, and a Publisher's Release in the form of Exhibit "B"
attached hereto by each publisher of all or any part or ver-
sion of the Property permitted hereunder.

2.  (a)  To prevent the reversion of rights to Author
hereunder, Purchaser shall pay Author the additional sum of
Two Hundred Thousand Dollars ($200,000) not later than

LAW OFFICES

**ARMSTRONG & HIRSCH**

Mr. Irving Paul Lazar
March 18, 1985
Page 2

twenty-four (24) months following the date of execution hereof
or upon commencement of principal photography of the first
motion picture or television production ("Picture"), whichever
shall first occur.

(b)  If the Picture is intended for initial broadcast
in the United States as a television motion picture or mini-
series, and the broadcast length of the Picture exceeds five
(5) hours in length, Purchaser shall pay Author the additional
sum of Thirty Thousand Dollars ($30,000) for each hour (pro-
rated for segments of less than an hour) within ten (10) days
following the initial broadcast of the Picture.

(c)  If the Picture is intended for initial general
theatrical release in motion picture theatres in the United
States, in lieu of any payment under paragraph 2(b) above,
Purchaser shall pay Author the additional sum of One Hundred
Thousand Dollars ($100,000) within ten (10) days of such thea-
trical release in the United States.

(d)  If the sum due pursuant to Paragraph 2(a) is not
paid to Author by the applicable date provided herein, all
rights granted herein shall revert to Author and neither party
shall have any further obligation to the other (including
without limitation, the obligation to make any further payment
whatsoever) and this Agreement and all restrictions contained
herein shall be of no further force or effect whatsoever
following the last date referred to upon which Purchaser is
entitled to make appropriate payment to Author hereunder.  In
the event of any such reversion, Purchaser shall deliver to
Author a quitclaim of all rights in and to the Property, but
no failure to deliver such quitclaim shall affect the rever-
sion to Author of all rights in and to the Property, and
Author and Purchaser agree, in such event, to execute,
acknowledge and deliver such documents as either party may
reasonably require to evidence the cancellation and termina-
tion of this Agreement, and the reversion of all rights in and
to the Property to Author and the release of Purchaser from
all obligations to Author under this Agreement.

3.  Author hereby reserves the following rights
("Reserved Rights") in and to the Property:

(a)  All publishing rights in and to the Property,
including without limitation, the right to publish the
Property in a book or such other written form as Author may
deem advisable; provided, however, that Purchaser shall have

LAW OFFICES

# ARMSTRONG & HIRSCH

Mr. Irving Paul Lazar
March 18, 1985
Page 3

the customary right (for advertising and publicity purposes) to broadcast, prepare, publish and copyright publications in newspapers, magazines and periodicals of all types, any synopsis, excerpts, summaries, abridged and/or revised versions of the Property, resumes and stories (all of which shall collectively be referred to as "synopses" herein) of the Property, or any part thereof, for any motion picture version thereof, no one of which, however, shall exceed seven thousand five hundred (7,500) words in length, and the rights to use said synopses in heralds, programs, booklets, posters, lobby displays, pressbooks, trade publications, newspapers, magazines and other periodicals, commercial and other tie-ups, and all other media of advertising and publicity whatsoever (and to copyright said synopses in Purchaser's name in all countries of the world), provided, no synopses shall be serialized or represented as having been written by Author without Author's prior written consent;

(b)  All legitimate, dramatic and musical live stage rights.  Author agrees not to dispose of, exercise or permit the exercise of the reserved stage rights for a period of three (3) years from the first general release or initial television broadcast of the Picture in the United States or five (5) years from the date that payment under Paragraph 2(a) hereof may be paid, whichever first occurs;

(c)  All radio rights, subject, however, to Purchaser's right to broadcast, transmit and present for advertising, promotion and publicity purposes, all or any part of the Property, or any adaptation, version, excerpt or sketch therefrom or based thereon, and announcements of or concerning the Property and/or any motion picture version thereof, by any means whatsoever, provided no such radio broadcasts shall exceed fifteen (15) minutes in duration, nor shall the same be serialized.  Author agrees not to dispose of, exercise or permit the exercise of the reserved radio rights for a period of five (5) years following the first general release or initial television broadcast of the Picture in the United States or seven (7) years following the date that payment under Paragraph 2(a) hereof may be paid, whichever first occurs;

(d)  The exclusive right to produce the Property by means of live television with living actors appearing and speaking in the immediate presence of the television audience.  Author agrees not to exercise the reserved live television rights for a period of five (5) years following the

LAW OFFICES
ARMSTRONG & HIRSCH

Mr. Irving Paul Lazar
March 18, 1985
Page 4

first general release or initial television broadcast of the
Picture in the United States or seven (7) years following the
date that payment under paragraph 2(a) hereof may be paid,
whichever first occurs.  As used herein, live television
rights shall be limited to a "one shot" national network basis
as a free television special and shall include the right to
make a recording of such live performance for original broad-
cast and for broadcasts on a delayed basis (within sixty (60)
days of the original network broadcast) only.

(e)  If Purchaser shall have commenced principal
photography of a remake, sequel, television series or other
television production based upon the Property, then the
restrictive holdback periods referred to in this Paragraph 3
and Paragraph 10(c) hereof shall be further extended until the
expiration of three (3) years (in the case of Paragraph 3(b)
hereof) or five (5) years (in the other cases) following the
initial general release or broadcast in the United States of
such remake, sequel, the last episode of a television series
or other television production.  Any disposition of the
Reserved Rights shall be subject to Paragraph 10 hereof.

(f)  Author's reserved rights relate only to the
Property and not to any screenplay, teleplay, music, lyrics,
sequels or other material written, created or commissioned by
Purchaser, even though the same contains characters and other
elements of the Property.

4.    If Purchaser shall produce the Picture based upon the
Property hereunder, Purchaser shall pay Author an amount equal
to 5% of 100% of the net profits derived from the Picture. If
the Picture is intended for initial general theatrical release
in motion picture theatres in the United States, "net profits"
will be defined, computed, accounted for and paid in accor-
dance with the definition of such net profits in Purchaser's
agreement with the third party ("Financier") financing the
production and/or distribution of the Picture.  If, however,
the Picture is intended for initial television broadcast in
the United States, "net profits" shall be defined, computed,
accounted for and paid in accordance with Exhibit "C" attached
hereto and by this reference made a part hereof.

5.    If Purchaser shall produce a theatrical motion
picture which constitutes a remake of the Picture, Purchaser
shall pay Author the sum of One Hundred Sixteen Thousand Six
Hundred Sixty-Seven Dollars ($116,667), such sum to be paid
within thirty (30) days following commencement of principal

LAW OFFICES

# ARMSTRONG & HIRSCH

Mr. Irving Paul Lazar
March 18, 1985
Page 5

photography of each such remake, plus an amount equal to 1.66% of 100% of the net profits derived from each such remake.

6. If Purchaser shall produce a theatrical motion picture which constitutes a sequel to the Picture, Purchaser shall pay Author the sum of One Hundred Seventy-Five Thousand Dollars ($175,000), such sum to be paid within thirty (30) days following commencement of principal photography of each such sequel, plus an amount equal to 2-1/2% of 100% of the net profits derived from each such sequel.

7. If Purchaser shall produce a television motion picture or mini-series based upon (and subsequent to) the Picture and the Property, and a leading character therein is a character taken from the Property, Purchaser shall pay Author the sum of Fifteen Thousand Dollars ($15,000) per hour (prorated for segments of less than one (1) hour) of such television programming, plus an amount equal to 2-1/2% of 100% of the net profits derived form each such motion picture or mini-series.

8. If Purchaser shall produce a television series ("Series") based upon the Picture and the Property, and a leading character therein is a character taken from the Property, Purchaser shall pay Author a royalty per each new Series program produced:

| | | |
|---|---|---|
| Thirty (30) Minutes | - | $1,000 |
| Sixty (60) Minutes | - | $1,500 |
| Ninety (90) Minutes | - | $2,000 |

The applicable sum shall be paid within thirty (30) days following the initial telecast of each such Series program.

9. Purchaser shall accord Author credit on positive prints of the Picture, and in all paid advertising relating primarily to the Picture issued by or under the direct control of Purchaser wherever the screenwriter(s) credit appears (subject to customary exclusions and exceptions) on a separate card in the main titles, in a size, type and style not less than the size used to display the credit given to the screenwriter(s) on the Picture, substantially as follows:

(a) If the Picture has the same title as the Property, such credit shall read: "Based Upon The Novel By Larry McMurtry".

LAW OFFICES
ARMSTRONG & HIRSCH

Mr. Irving Paul Lazar
March 18, 1985
Page 6

(b)  If the Picture does not have the same title as
the Property, such credit shall read: "Based Upon The Novel
'Lonesome Dove' By Larry McMurtry."

Subject to the foregoing, Purchaser shall determine, in its
sole discretion, the manner, form, size, style, nature and
placement of any credits and no casual or inadvertent failure
of Purchaser to comply with the provisions hereof with respect
to credit shall constitute a breach of this Agreement by
Purchaser.  Purchaser shall use its reasonable efforts to cure
prospectively any such failures promptly following notice from
Author if such failures are reasonably capable of being so
cured.

10.  If Author shall create or desire to create or cause
to be created or written a sequel literary work or any other
material (an "author-written sequel" hereunder) based in whole
or in part upon the Property (all rights other than the motion
picture, television, and allied rights in and to the charac-
ters contained in the Property and publishing rights in said
author- written sequel being hereinafter referred to as
"Sequel Rights" for purposes of this Paragraph 10) and/or if
at any time during which Author is permitted to do so under
the provisions of this Paragraph 10, Author shall elect to
exercise, sell, license, exploit, or otherwise dispose of any
of the Reserved Rights (which will exclude publishing rights
other than the limited rights referred to in the proviso of
Paragraph 3(a) hereof for purposes of this Paragraph 10) or
Sequel Rights, Author agrees that it shall not so exercise,
sell, license, exploit and/or dispose of any such Reserved
Rights or Sequel Rights without first complying with the fol-
lowing rights:

(a)  If Author desires to exercise, sell, license
and/or exploit any of the Reserved Rights or Sequel Rights,
Author shall first give Purchaser notice thereof and Author
and Purchaser shall thereupon negotiate in good faith for the
purpose of reaching an agreement whereby Purchaser would
undertake such exercise and/or exploitation; if Purchaser and
Author shall fail to reach an agreement within thirty (30)
days following any such notice, Author shall have no further
obligation to Purchaser with respect to the particular rights
which were the subject of such negotiations, provided that
Author shall comply with the other provisions of this
Paragraph 10.

LAW OFFICES

# ARMSTRONG & HIRSCH

Mr. Irving Paul Lazar
March 18, 1985
Page 7

    (b)  If Author and Purchaser shall fail to reach an agreement within said thirty (30) day period as aforesaid, thereafter Author may deal with third parties provided that Author shall not exercise, sell, license, exploit or otherwise dispose of any Reserved Rights or Sequel Rights or accept any bona fide offer which Author has received for any such rights on terms less favorable to Author (and, therefore, more favorable to Purchaser) than those last rejected by Purchaser during the negotiation referred to in Paragraph 10(a) above. If Author wishes to accept an offer that would be on terms less favorable to Author than those last rejected by Purchaser during such negotiations, Author shall so notify Purchaser and Purchaser shall have the right to purchase and acquire any such rights upon the same terms and conditions as set forth in such notice; the terms and conditions which Purchaser shall be obligated to accept in order to exercise such right of first refusal shall not include terms and conditions specified in said notice which cannot be met as easily by one person as by another, such as required employment or use of a certain writer, director, star, etc.  At any time within thirty (30) business days after receipt of such notice, Purchaser may notify Author that Purchaser wishes to acquire any such rights upon the terms and conditions so specified, and Author shall grant such rights to Purchaser upon said terms and conditions.  If Purchaser fails to so notify Author, Author shall again be free to dispose of any such rights to any third party, in a bona fide, arms-length transaction, but only upon terms previously specified in Author's notice to Purchaser or upon terms more favorable to Author (and, therefore, less favorable to Purchaser) than those specified in said notice, it being understood and agreed that such right may not be offered or disposed of by Author or any third party on any more favorable terms and conditions (to Purchaser) than previously so specified in Author's said notice, without Author first offering such rights to Purchaser as hereinabove provided.

    (c)  Inasmuch as all of the motion picture, television and allied rights in and to the characters contained in the Property are exclusively granted to Purchaser hereunder, Author shall not grant to any third party any such rights in connection with any permitted disposition of any author-written sequel.  Author shall not make or permit any disposition or exploitation of any other motion picture, television or allied rights in any author-written sequel to any person, firm or corporation other than Purchaser until after a period of three (3) years from the date of the first general release

LAW OFFICES
ARMSTRONG & HIRSCH

Mr. Irving Paul Lazar
March 18, 1985
Page 8

of the Picture in the United States, or five (5) years from
the last date by which Purchaser must make the payment speci-
fied in Paragraph 2(a) hereof, whichever first occurs.  After
the foregoing holdback periods, Author shall not dispose of
any such motion picture, television and allied rights in more
than one author- written sequel in any respective one (1) year
period (such one (1) year periods to begin on the date of
and/or each subsequent anniversary of the expiration of the
applicable holdback period).

11.   Author represents, warrants and agrees:  that he is the
sole author of the Property and is the sole and exclusive
owner of all rights (including without limitation the copy-
right) in and to the Property throughout the world herein
granted to Purchaser, and Author has not heretofore sold,
assigned, transferred, licensed, granted or otherwise disposed
of, nor will Author hereafter sell, assign, transfer, license,
grant, encumber, or dispose of, the rights herein granted to
Purchaser; that Author has the sole right, power and authority
to make and enter into this Agreement and to convey the rights
herein granted without restriction or limitation; that the
Property is wholly original with Author and is not and will
not be taken from, adapted or copied, in whole or in part,
from any other literary works; that as to living people iden-
tifiable in the Property, Author has acquired written permis-
sions and releases, permitting the use of said person's name,
likeness, and life story in connection with the rights granted
hereunder and Author hereby assigns such rights to Purchaser;
that neither the Property nor any part thereof infringes or
will infringe upon, nor will the full use by Purchaser of all
rights acquired hereunder infringe upon or violate in any way
the copyright, common law right, or any other rights of any
person, firm or corporation, nor does or will the Property, or
any part thereof, violate any right of privacy or right of
publicity or constitute a libel or defamation or otherwise
violate or infringe upon any other right of any person, firm
or corporation.  Author shall indemnify Purchaser with respect
to any breach of any representation, warranty or agreement
made by Author herein.

12.   Notwithstanding anything contained herein to the
contrary, without limiting any other rights Purchaser may have
at law, in equity or hereunder, Author agrees that if there is
any claim and/or litigation which if proven to be true, would
involve a breach of any of the representations, warranties and
agreements made by Author hereunder, and the same would mate-
rially limit any of the rights acquired by Purchaser here-
under, the last date by which Purchaser must make the payment

LAW OFFICES
# ARMSTRONG & HIRSCH

Mr. Irving Paul Lazar
March 18, 1985
Page 9

required by Paragraph 2(a) hereof shall be automatically
extended until no claim and/or litigation involving any breach
or alleged breach of any such representation, warranty or
agreement of Author is outstanding.  If such claim and/or
litigation shall not be dismissed within sixty (60) days after
Purchaser or Author have notice thereof or shall result in a
settlement or a judgment in favor of any third party claimant,
Purchaser may, in addition to any other rights or remedies it
may have at law, in equity or hereunder, rescind this Agree-
ment in which event, notwithstanding anything contained herein
to the contrary, Author shall thereupon repay to Purchaser all
monies theretofore paid by Purchaser to or on behalf of Author
hereunder.  Purchaser and Author shall consult with one
another regarding the settlement of any such claim, but
Purchaser's decision regarding the same shall be final and
binding upon Author.

    13.    In the event that Purchaser is materially hampered in
preparing or producing the Picture by reason of any law, ordi-
nance, regulation, order, judgement or decree, acts of God,
earthquake, flood fire, catastrophe or shortage of materials,
or labor disturbance (including, without limitation, if the
Writers Guild of America should strike or withhold its members
services), the last date by which Purchaser must make the
payment required by Paragraph 2(a) hereof shall be automati-
cally extended by a number of days equal to the total duration
of such event.

    14.    All notices and payments to Author hereunder shall be sent
to him in care of you at the above address and receipt by you
of such payments shall be good and valid discharge of all such
indebtedness; Author hereby irrevocably authorizes and directs
you to deduct an amount equal to ten percent (10%) of all such
sums as your commission for acting as Author's agent here-
under.  Any notices to Purchaser shall be sent to it at Motown
Productions, 6255 Sunset Boulevard, Los Angeles, California
90028, Attention: Joan Whitehead Evans, Esq. with a copy to me
at the above address.  All notices shall be sufficiently given
when the same shall be deposited so addressed, postage pre-
paid, return receipt requested, in the United States mail, or
by personal delivery or upon the sending of a cable or tele-
gram, prepaid and addressed as aforesaid.

    15.    The parties contemplate execution of a more formal
agreement incorporating the foregoing and such other terms
(which shall include provisions relating to rights, warran-
ties, indemnities, name and likeness, no rescission or injunc-
tive relief for Author, default, force majeure, etc.), which

LAW OFFICES

# ARMSTRONG & HIRSCH

Mr. Irving Paul Lazar
March 18, 1985
Page 10

are customary in literary acquisition agreements in the motion
picture industry.  Unless and until such formal agreement is
executed, however, this letter shall be a binding agreement
between the parties and may not be modified except by a writ-
ten instrument signed by both parties.

   If the foregoing is acceptable to you and your client,
please have a copy of this letter signed and returned to me
for signature on behalf of Motown Productions.

Sincerely yours,

ALAN J. LEVINE

AGREED TO AND ACCEPTED:

PURCHASER:

MOTOWN PRODUCTIONS

By

AUTHOR:

LARRY McMURTRY

Date of Execution: 3-22-85, 1985

LAJO4L

cc:  Suzanne de Passe
     Suzane Coston
     Michael Weisbarth
     Joan Whitehead Evans, Esq.
     Elliot Chaum, Esq.
     Michael Black

EXHIBIT "A"

SHORT FORM ASSIGNMENT

KNOW ALL MEN BY THESE PRESENTS:  that in consideration of the payment of One Dollar ($1.00) and other good and valuable consideration, receipt of which is hereby acknowledged, the undersigned Larry McMurtry ("Author") hereby sells, grants, assigns and sets over unto Motown Productions ("Purchaser"), and its representatives, heirs, successors and assigns in perpetuity and throughout the world, the sole and exclusive motion picture rights, television motion picture, and certain other television and radio rights and certain allied and incidental rights including limited publication radio and television rights for advertising and exploitation purposes, in and to the literary, dramatic and/or musical writings and materials ("Property") described as follows:

Title:          "Lonesome Dove"

Author:      Larry McMurtry

Date and Place of Publication:

Name of Publisher:

Copyright Date and Registration:

Name of Copyright Registrant:

including all plots, themes, title or titles, dialogue, language, incidents, action, story, characters and copyrights thereof and all renewals and extensions of such copyright, and any translations, novelizations, dramatizations, sequels, remakes and other adaptations or versions thereof, now made or hereafter created, made or permitted to be made by the Author.  This assignment is of all rights acquired, pursuant to a certain Agreement dated as of March 18, 1985, between the parties hereto and is limited by and subject to all of the terms and conditions of said Agreement.

Author shall obtain or cause to be obtained renewals of all United States copyrights in and to the Property, whether or not referred to herein, and shall assign said rights under said renewal copyrights to Purchaser without further consideration.  Purchaser is also hereby empowered to bring, prosecute, defend and appear in suits, actions and proceedings of any nature under or concerning all copyrights in and to the

-1-

Property and all renewals thereof, or concerning any infringement of any such copyright or renewal copyright, or interference with any of the rights hereby granted to Purchaser under said copyrights or renewals thereof, in its own name or in the name of the copyright proprietor, but at the expense of Purchaser, and at its option, Purchaser may join such copyright proprietor and/or Author as a party in such suit, action or proceeding; any recovery therefrom is hereby assigned to Purchaser.

Author hereby assigns to Purchaser all documents heretofore or hereafter executed in favor of Author by any third party insofar as such documents affect or pertain to any of the rights herein granted to Purchaser.

IN WITNESS WHEREOF, the undersigned has executed this assignment as of * 22nd day of March, 1985.

AUTHOR:

LARRY McMURTRY

STATE OF CALIFORNIA     )
                        )  ss.
COUNTY OF LOS ANGELES   )

On this _____ day of _____, 19___, before me, the undersigned, a Notary Public in and for said State, personally appeared LARRY McMURTRY, known to me, or proved to me on the basis of satisfactory evidence, to be the person who executed the within instrument, and acknowledged to me that he duly executed the same.

WITNESS my hand and official seal.

_____
Notary Public in and for said
        County and State

LAJ04L

-2-

EXHIBIT "B"

## PUBLISHER'S RELEASE

KNOW ALL MEN BY THESE PRESENTS: That in consideration of the payment of One Dollar ($1.00) and other good and valuable consideration, receipt of which is hereby acknowledged, the undersigned Larry McMurtry, hereby acknowledges and agrees, for the express benefit of Motown Productions and his or its heirs, representatives, successors and assigns forever, that the undersigned has no claim to or interest in the worldwide motion picture rights (silent, sound, talking), television rights, radio broadcasting rights or any other rights of any other kind other than publication rights heretofore granted to the undersigned, in or to that certain literary work published by the undersigned and described as follows:

Title:  "Lonesome Dove"

Written By:  Larry McMurtry

Date and Place of Publication:

Copyright Registration:

The undersigned hereby consents to the publication and copyright by and/or in the name of said author, his or heir heirs, representatives, licensees and assigns, in any and all languages, in any and all countries of the world, and in any form or media, of synopses, abridged versions, serializations and/or novelizations, not exceeding seven thousand five hundred (7,500) words in length each, of the said literary work and/or any motion picture, television or other version thereof based in whole or in part upon the said literary work, for the purpose of advertising, publicizing and/or exploiting any such motion picture, television or other versions.

IN WITNESS WHEREOF, the undersigned has executed this instrument this _____ day of _____, 19____ .

By _____
Its _____

-1-

STATE OF _____ )
                        )  ss.
COUNTY OF _____ )

    On this _____ day of _____, 19 ____, before
me, the undersigned, a Notary Public in and for said State,
personally appeared _____,
known to me, or proved to me on the basis of satisfactory
evidence, to be the _____ of _____,
and acknowledged to me that he duly executed the same for and
on behalf of said corporation.

    WITNESS my hand and official seal.


                             _____
                             Notary Public in and for said
                             County and State

LAJ04M

-2-

Exhibit "C"

NET PROFITS

Part of Agreement ("Principal Agreement") dated March 18, 1985, between Motown Productions ("Producer") and Larry McMurtry ("Participant"), relating to the television program presently entitled "Lonesome Dove" ("Program").  To the extent Participant is entitled to any portion of "Net Profits" from the Program pursuant to the Principal Agreement, said Net Profits shall be defined, computed, accounted for and paid in accordance with this Exhibit.

    I.    <u>General Computation</u>.

"Net Profits" means "Gross Receipts," as defined in Article II, less the following, deducted in the following sequence:

    A.  "Distribution Fees" as defined in Article III;

    B.  "Distribution Expenses" as defined in Article IV;

    C.  "Production Cost" as defined in Article V, with interest on the unrecouped portion thereof at two percent (2%) per annum above the prime rate charged from time to time by Producer's bank; interest shall be deducted before principal; provided, however, if such interest rate exceeds the maximum lawful rate of interest which may be charged by Producer, then such interest shall be reduced to the maximum lawful rate; and

    D.  All contingent deferments, debts, and recoupments and other contingent amounts not included in Production Cost, other than net profit participations payable to third parties.

    II.    <u>Gross Receipts</u>.

    A.  "Gross Receipts" means all cash received (in U.S. dollars in the United States) by Producer for the right to cause the exhibition of the Program in substantially complete form to an audience in any medium, such as television, CATV, or theatrical or non-theatrical direct projection, any reissue of the Program, any foreign language or dubbed version thereof, net recoveries of Producer from infringement of copyright of the Program, and the amounts referred to in Article II.D and E.  Gross Receipts shall not include the following:

    1.  The receipts of any theatre or other user (including, but not limited to, radio or television broadcasters, cable and closed circuit producers and distributors, book or music publishers, phonograph record producers or distributors, and merchandisers, manufacturers and the like) of the Program or any rights connected therewith;

-1-

2.   Any revenue from any theatrical or television remake of or sequel to, or any series based upon, the Program, or the sale, transfer or assignment of all or any part of Producer's right to produce and/or exploit the same;

3.   Any monies received from trailers, lithographs, lobby displays, slides and advertising accessories prepared and distributed in connection with the Program;

4.   Any revenue from the exploitation of any music in the Program or any music publishing, commercial tie-ups, endorsements or merchandising rights thereof except to the extent provided in Article II.D and E;

5.   Such monies derived from the distribution of the Program as are contributed to charity; and

6.   Any monies received for the use or disposition of any portion of the Program as stock footage, cut-outs, trims, tracks, backgrounds, sound effects, props, costumes, stock shots or other properties, or monies held as deposits that are subject to refunds.

B.   If the Program is distributed in whole or in part by an Outside Distributor, Gross Receipts from such distribution shall be cash received by Producer from such Outside Distributor after all charges, fees, costs, participations in net or gross receipts or other contingent payments, and all other deductions which have been made pursuant to Producer's agreement with each such Outside Distributor; provided, however, that to the extent any such items are deducted from Gross Receipts, pursuant to this Article II.B they shall not again be deducted as a Distribution Expense pursuant to Article IV.

C.   Cash received by an Outside Distributor is deemed Gross Receipts when Producer receives the Outside Distributor's report of the computation of the portion of such cash to which Producer is entitled and payment of such portion (or when Producer receives such Outside Distributor's report showing that, after the deductions and any set-offs made by the Outside Distributor on the report, Producer is not entitled to payment of any portion of such cash).  No advance or security deposit paid to Producer by any Outside Distributor shall constitute Gross Receipts; but the Gross Receipts that are shown on any report received by Producer from an Outside Distributor on which all or any part of such advance or security deposit is set off against the payment otherwise due to Producer pursuant to such report, shall be deemed received when Producer receives such report.  Gross Receipts are subject to adjustments for refunds, rebates, credits, settlements, and discounts.  If any sum that is owed by a Distributor to a licensee in connection with the exhibition of the Program, such as a cooperative advertising allowance, shall be set off by the licensee from the amount owed for the right to cause such exhibition, the Gross Receipts shall be augmented by such sum.  "Distributor" means any distributor of the Program, including Producer if and to the extent Producer does its own licensing and distributing.  "Outside Distributor"

means any Distributor other than Producer or any other entity owned or controlled by, owning or controlling, or under common ownership or control with, Producer.

D.  With regard to music publishing receipts, Producer will include in Gross Receipts a sum equal to fifty percent (50%) of the "publisher's net share" of all mechanical reproduction and performing fees received (in U.S. dollars in the United States) by a music publisher which is owned or controlled by Producer with respect to music and/or lyrics written specifically for and synchronized with the Program, and as to which such publisher is vested with all publishing rights.  The "publisher's net share" of mechanical reproduction fees shall be the full amount paid by the licensee, less any portion thereof paid to any third party who may share in such publisher's receipts, and less composer's royalties, and less charges of any agent, trustee or administrator acting for the publisher and/or others in the collection of such fees, in the amount of fifteen percent (15%) thereof, if any; or, if the publisher shall administer the collection of such fees itself, a charge therefor not to exceed fifteen percent (15%) of such fees.  "Mechanical reproduction" fees do not include synchronization license fees for use of the music by Producer, but do include sychronization fees received from unrelated third parties.  The "publisher's share" of performing fees shall be the net amount actually received by the publisher from any performing r ights society in respect of the music involved; or, if Producer or the publisher shall administer the collection of all or any part of performance fees, the full amount of all performance fees collected, less composer's share and reasonable costs and expenses in administering the collection of such fees.  If the publishing rights are vested in any unrelated third party, and if a portion of mechanical reproduction or performing fees is paid by such third party to Producer, then all of such portion paid to Producer shall be included in Gross Receipts.

E.  With regard to records embodying all or a portion of the sound track of the Program, and with regard to exploitation of merchandising and publishing rights in the Program, Producer shall be entitled to license such rights in accordance with Producer's usual and customary terms to any third party whatsoever, including without limitation to a company owned or controlled by Producer.  The monies received by such licensee shall not be included in Gross Receipts, but all sums from said licenses actually received by Producer shall be included in Gross Receipts, unless Participant separately shares in such sums pursuant to the Principal Agreement or otherwise.

III.  <u>Distribution Fees</u>.

A.  "Distribution Fees" shall mean any and all sums which are actually paid by and/or charged to Producer by Distributor as a distribution or similar fee on account of the distribution of the Program, which, if Producer is the Distributor, shall be the following percentages of Gross Receipts:

1.  Ten percent (10%) for the initial national network free television sale of the Program (including reruns accomplished as a part of such sale) if the initial use of the Program is on national network free television in the United States in prime time (out of which Producer shall bear any agency packaging commission payable on account of such sale);

2.  Twenty-Five percent (25%) for any national network free television sale in the United States not specified above;

3.  Forty percent (40%) for any free television sale in the United States other than on a national network;

4.  Twenty-Five percent (25%) for the initial free television sale to a Canadian network (i.e., CTV, CBC or Global), including reruns accomplished as part of such sale;

5.  Forty percent (40%) for any free television sale outside the United States;

6.  Forty percent (40%) for any theatrical or non-theatrical direct projection sale;

7.  Fifteen percent (15%) for any outright sale or license of distribution rights to an Outside Distributor for a flat sum where such Distributor is not obligated to account to Producer;

8.  Fifty percent (50%) for any sale not specified above.

B.  "Sale" means any sale, license or grant of rights.  In the event that any distribution agreement between a Producer and a Distributor provides that said Distributor shall retain a percentage of the Gross Receipts without any allocation of the portion of the Gross Receipts retained by the Distributor between distribution fees and other items, including, without limitation, distribution expenses, recoupment of non-returnable advances previously applied by the Producer to the Program and said Distributor's profits, if any (sometimes referred to in the theatrical motion picture industry as a "gross deal"), then the entire percentage of the Gross Receipts so retained by said Distributor shall be deemed to be the distribution fee payable to said Distributor and there shall be no separate deduction hereunder for said Distributor's distribution expenses, except to the extent, if any, that such expenses are charged against a portion of Gross Receipts payable to the Producer pursuant to said distribution agreement.

IV.  Distribution Expenses.

A.  "Distribution Expenses" means all costs and expenses incurred and payments made by Producer and any Outside Distributor(s) in connection with the sale, lease, license, distribution, exhibition or other disposition of the Program or any subsidiary rights therein, in all media, including but not limited to:

-4-

1.  Any re-run, use, royalty, or other payment with respect to any person or any right, and any payroll tax or union fringe benefit payment in connection therewith;

2.  Any cost in connection with the preparation, making, duplication, editing, cutting, dubbing, subtitling, possession, packing, inspection, repair, storage, protection, and shipment (such as to or from any laboratory, Distributor, or licensee, including the payment of any laboratory, Distributor, or licensee, including the payment of any customs, fees, taxes, or imposts in connection therewith) of any negative or positive film materials, audio or video tape, still photograph, script, continuity sheet, or cue sheet, including but not limited to costs of facilities, laboratory work, raw film or raw audio or video tape stock, reels, containers, and other materials or services;

3.  Any advertising, publicity, or promotion cost or expense (whether in the form of commissions, allowances, percentages, percentage of gross receipts or the like), any agency fee or commission;

4.  Any share of Gross Receipts (whether before or after breakeven) or similar payments payable to any third party in excess of the amount thereof which is included as a Production Cost hereunder;

5.  Any tax, tariff or fees levied upon, payable with respect to, or arising in connection with the exploitation, use, distribution, revenues, or materials of the Program, including but not limited to sales, gross receipts, turnover, withholding, remittance, excise, use, and personal property or similar taxes, but excluding any net income, corporate, franchise, or excess profits tax;

6.  Any cost of converting, transmitting, or remitting currency; any cost of collecting money from, checking the receipts or costs of, or auditing any Distributor or licensee;

7.  Any litigation or other cost in connection with any claim brought by or against Producer, Participant, and/or any Distributor or licensee (including but not limited to any amount paid on any judgment or settlement);

8.  Any amount charged to Producer by any Outside Distributor (except the applicable Distribution Fee specified in Article III);

9.  Any government fee or the cost of any government license or permit, including but not limited to those required for import, export, licensing, exhibition, or censorship, or the cost of contesting any of the same or any other regulation or law affecting the Program;

10.  Any cost of obtaining, maintaining, protecting, or registering any intangible rights, including but not limited to copyrights, titles, trademarks and trade names, in connection with the Program or any element thereof;

11. Any cost of protecting the Program physically or from legal encumbrance, by security measures, legal action, or otherwise;

12. Any legal and accounting fees or court costs in connection with this Article IV;

13. Any cost of insurance, including but not limited to errors and omissions, negative, print, liability or other insurance covering physical materials;

14. A fee of Fifty Thousand Dollars ($50,000) for Producer in connection with the preparation of any theatrical version of the Program;

15. Trade association dues and assessments, and support payments to industry academies or institutions; and

16. All similar or dissimilar expenses of every kind and nature incurred by or for the account of Producer or any Distributor in connection with the sale, licensing, exhibition, distribution, advertising and exploitation of the Program and any rights therein.

Producer shall have the right to set up reserves in an amount estimated by Producer to be sufficient to cover any Distribution Expenses.

B. No sum excluded from Gross Receipts shall be included as a Distribution Expense, and no sum included as a Distribution Fee shall be included as a Distribution Expense.

V. Production Cost.

A. "Production Cost" means all costs and expenses incurred in connection with "Production" (which is deemed to mean the development, preproduction, production, and postproduction of the Program) calculated according to generally accepted accounting principles in the television industry, including without limitation:

1. Any cost of a type listed in Article IV if incurred in connection with Production rather than distribution (it being understood that any particular item included in Production Cost may not also be a Distribution Expense);

2. Any cost for the right to use or purchase facilities, equipment, materials, or personnel ("above the line," below the line," or other) intended to be used in connection with Production including, but not limited to, performers, writers, directors, and producers;

3. Any cost of writing, or of rights to acquire or use underlying literary, artistic, musical, intellectual property, materials or other rights, intended to be used in connection with the Program;

4. Any financing costs and charges (other than interest);

-6-

5.   A production fee for the Program, which shall be deemed a direct cost included as an item of Production Cost, in an amount equal to Fifty Thousand Dollars ($50,000) per hour;

6.   Any cost of cast insurance, negative insurance, or insurance covering personal injury or property damage, and any cost of title or copyright search or registration;

7.   Cost of production auditor and accounting fees, and any cost of legal services required in connection with Production;

8.   Any contingent deferred amount paid or payable for the fair value of rights and/or services rendered in Production, whether as a flat amount or a participation in or percentage of Gross Receipts (whether before or after so-called "break even" and whether such "break even" is actual or fictitious), or similar payments;

9.   If the aggregate of all other items of Production Cost (excluding any item of Production Cost that was not budgeted out that was either covered by insurance or caused by an event of force majeure) shall exceed the budget of the Program by more than five percent (5%) then, an amount equal to the excess shall be deemed an additional direct cost included as an item of Production Cost; and

10.   Any overhead costs and/or fees paid or incurred by or charged to Producer by an Outside Distributor and an overhead cost equal to fifteen percent (15%) of all other items of Production Cost.

B.   Any item may be included in Production Cost when the obligation to pay is noncontingent, even if payment has not yet been made.  If Producer furnishes any of its own facilities, equipment, materials, or services in connection with Production for which Producer has a standard rate or a reasonable "loanout fee" or such sum as Producer would otherwise have paid to a third party, the amount of such standard rate, loanout fee, or the amount that otherwise would have been paid to such third party shall be deemed a direct cost included as an item of Production Cost.  If a person regularly employed by Producer shall be assigned to render services on the Program, the standard rate or loanout fee shall be such reasonable portion of such person's salary as Producer may allocate to the Production Cost.

VI.   <u>Statements and Payments</u>.

"**Accounting period**" means each calendar year or other annual period that Producer may from time to time elect.  Within ninety (90) days after the end of each accounting period, Participant shall be sent a statement showing the computation of Net Profits for such accounting period and Participant shall be paid his or its share of such Net Profits, if any.  No statement need be sent for any accounting period in which there are no Gross Receipts.  All expenses, such as Distribution Expenses and items of Production Cost, incurred in any accounting period that are not recovered from Gross Receipts for the same accounting period may be

-7-

carried forward or backward to any other accounting period. Any with-
holding or deduction required by law may be made. Any item in an Outside
Distributor's statement that is acceptable to Producer in its business
judgment is deemed acceptable to Participant. A reasonable sum may be
retained from Net Profits of one or more accounting periods to establish a
reserve for uncomputed retroactive charges, residuals and for deferred
items of costs. Losses incurred with respect to one accounting period may
be applied against profits derived from any preceding or subsequent
accounting.

VII.   Conclusiveness of Statements.

Producer shall keep all of its books and records directly
relating to this Exhibit in accordance with accepted accounting prin-
ciples. Participant may, at Producer's offices and at reasonable times
within regular business hours, but not more than once per calendar year,
have a certified public accountant familiar with accounting procedures in
the television industry, inspect and make copies of any such books and
records not previously inspected (to the extent the information contained
therein has not become incontestable pursuant to this Article VII), all at
Participant's expense. Each such inspection shall be completed within
thirty (30) consecutive days. Producer's methods of treating any amount
referred to in this Exhibit for Producer's tax or financial purposes will
have no bearing on the computation of Net Profits. Each statement here-
under shall be deemed conclusive unless Participant shall object thereto
to Producer in writing within eighteen (18) months after receipt thereof
and shall state in detail in such writing the basis for the objection.
Participant shall be barred from bringing any legal proceeding on the
subject matter of such objections later than twelve (12) months after
making such objections.

VIII.   Foreign Currency.

If any foreign government shall block the conversion or transmit-
tal of currency to be included in Gross Receipts, if Participant so
requests in writing, Producer shall (if permitted by applicable laws,
rules and regulations) pay Participant his or its share of Net Profits
applicable thereto by depositing the same in Participant's name and at
Participant's expense with such foreign depository as Producer shall
determine. If Prodcer shall make any such deposit, Participant shall pay
all costs and expenses in connection therewith.

IX.   Relationship of Parties.

A. Producer shall not be deemed a fiduciary, partner, or joint
venturer of Participant. Participant has no legal or beneficial ownership
interest in the Program, but only the contingent right to payment speci-
fied herein. Any pledge, hypothecation, mortgage, or other encumbrance of
the Program or any element thereof, or anything created pursuant to the
rights therein, or any assignment, sale or transfer of rights herein,
purported to be made by Participant, shall be void; provided, however,
that after the completion of Participant's performance under this

-8-

Agreement any assignment, sale, or transfer of Participant's right to receive payment under this Exhibit shall be valid if it shall be made specifically subject to Producer's rights herein; and provided further that in each instance in which Participant shall wish to make any such assignment, sale, or transfer, in whole or in part, to any third party, other than by gift or bequest, Participant shall first make a written offer to Producer, that by its own terms shall be irrevocable for at least thirty (30) days from Producer's receipt thereof, to make such assignment, sale, or transfer to Producer on the same terms and conditions on which such assignment, sale or transfer would be made to such third party. Participant waives any right to bring suit against Producer or any Distributor with respect to any matter in connection with this Agreement for relief other than money damages.

B. As between Participant and Producer, Producer shall have sole discretion: to make a fair allocation of any amount that is relevant under this Exhibit (such as Gross Receipts, a Distribution Expense, or an item of Production Cost) from any larger sum in which it is included; to determine whether to incur any Distribution Expense or item of Production Cost, when it is incurred, and how it is computed; to determine when the conversion and/or transmittal of currency shall occur and the exchange rate at which such conversion shall occur; to determine what items included in Production Cost shall be considered direct costs as distinguished from overhead; to determine all terms of each agreement, if any, for the distribution of the Program, or the exploitation of subsidiary rights, including but not limited to all terms affecting time, place, medium, frequency of use, and payment; to settle any claim with respect to any such agreement or with respect to the Program; to retain reasonable portions of Net Profits as reserves for contingent, uncomputed, or retroactive debts; and to commingle funds applicable to payments hereunder with other funds owned or held by Producer.  Producer makes no representation or warranty with respect to Producer's efforts in connection with the distribution of the Program or exploitation of subsidiary rights or that such distribution or exploitation will result in any minimum amount of Gross Receipts or Net Profits.

X.   Disposition of Rights.

A. Notwithstanding anything to the contrary and in addition to Producer's other rights, contained in this Exhibit, Producer shall have the sole right and discretion to sell or otherwise dispose of any or all of its rights to the Program to any person, firm or corporation.  In the event that Producer elects to sell or otherwise dispose of the Program or any interest therein or any right or rights therein or thereto granted by the terms of the Principal Agreement, such sale or disposition shall be made either (i) "subject to the rights of Participant," or (ii) including any or all rights of Participant under the Agreement and this Exhibit," as those terms are hereinafter defined:

1. A sale "subject to the rights of Participant" shall be deemed to have been accomplished by Producer if the purchaser or assignee of the Program or any interest therein or of any rights granted pursuant

-9-

to the Principal Agreement assumes the executory obligation of Producer to Participant hereunder arising from the future exploitation, exhibition, and turning to account of the Program or any interest therein or any rights under the Principal Agreement, to the same extent and in the same manner as Producer is then obligated to Participant pursuant to the Agreement and this Exhibit.  Upon the assumption of such obligations by such purchaser or assignee, Producer shall be released from and of any further obligations to Participant with respect to the payment of any share of Net Profits provided to be paid to Participant pursuant to the Principal Agreement or this Exhibit (such applicable share being hereinafter referred to as "participation") to the extent such participation is measured by receipts in the hands of such purchaser or assignee.  If Producer makes any sale or assignment subject to the rights of Participant, then the purchase price or other consideration received by Producer from such purchaser or assignee shall not be included in computing Gross Receipts as hereinabove defined and shall be retained solely by Producer, and such sale shall be deemed a novation.

2.  A sale "including any or all rights of Participant under the Principal Agreement and this Exhibit" shall be deemed accomplished upon any sale or assignment of the Program or any rights therein or any rights under the Principal Agreement if Producer makes such sale or assignment without obtaining an agreement by the purchaser or assignee to assume Producer's executory obligations to Participant hereunder.  In such event, Participant shall not be entitled to receive any participation based upon gross receipts in the hands of such purchaser or assignee, and all rights of Participant to any participation shall be deemed extinguished and terminated by such sale, subject, of course, to the accounting for and payment of any participation of Participant based on Gross Receipts derived by Producer from the exploitation and turning to account of the Program and the rights therein prior to such sale or assignment.  If Producer makes such sale or assignment including any or all rights of Participant under the Principal Agreement and this Exhibit then its gross receipts derived from such sale or assignment, after deducting therefrom all expenses, costs, fees and commissions incurred in connection therewith, shall be added to the Gross Receipts for the purpose of accounting for Participant's participation hereunder.

B.  If any sale or assignment pursuant to the foregoing provisions of this Article does not include all rights in the Program or all rights obtained by Producer under the terms of the Principal Agreement, then Producer shall continue to be obligated to account to Participant hereunder with respect to any rights it retains in the Program or obtained under the Agreement, to the same extent and with the same effect as it would have been obligated to account for Participant's participation based upon such retained rights in accordance with the terms of the Principal Agreement and this Exhibit.

LAJO4N