# EXHIBIT  B

## MEMORANDUM AGREEMENT

1.  <u>Producer</u>.  RHI Entertainment, Inc., 156 West 56th Street, New York, New York 10019.

2.  <u>Seller</u>.  Larry McMurtry, c/o Loeb and Loeb, 10100 Santa Monica Boulevard, Suite 2200, Los Angeles, California 90067, Attn:  Robert Thorne, Esq. or Gregory V. Redlitz, Esq.

3.  <u>Lender</u>.  Saria Company, Inc. (Fed. Id. No. ███████████ ), c/o Loeb and Loeb, 10100 Santa Monica Boulevard, Suite 2200, Los Angeles, California 90067, Attn: Robert Thorne, Esq. or Gregory V. Redlitz, Esq., providing the services of Seller and Diana Ossana as a writing team and as a team of executive producers (jointly and severally, "Team").

4.  <u>Work</u>.  Original literary work entitled "*Streets of Laredo*," written by Seller and owned in its entirety by Seller, and the theme, plot, characters, setting and story contained therein.

5.  <u>Motion Picture</u>.  A possible mini-series, presently intended to be six hours and released initially on United States network television (the "Network"), to be released, when an English language title is used, only under the title "Larry McMurtry's 'Streets of Laredo'".

6.  <u>Writing Services</u>.  Producer hereby engages from Lender, and Lender shall supply, on a pay-or-play basis, the following services of the Team:

6.1.  The writing services of Team to write a teleplay (the "Teleplay"), consisting of a first draft (the "First Draft"), a final draft (the "Final Draft"), a rewrite (the "Rewrite") and a polish (the "Polish") based on the Work for the Motion Picture.  In performing all of their services on the Teleplay, the Team will make reasonable efforts to incorporate Producer's suggestions and requests and which Team deems dramatically acceptable.  Team's writing services hereunder shall be performed as follows:

6.1.1.  Team shall write the First Draft, incorporating therein the suggestions of Producer.  Team shall commence writing the First Draft on or before February 1, 1994 and shall complete and deliver the First Draft on or before June 30, 1994;

6.1.2.  Following delivery of the First Draft, Producer shall have through August 15, 1994 to read the First Draft and to discuss possible changes and additions thereto with Team, and Team shall be available upon reasonable advance notice for such consultations by telephone.  On or before the end of said consultation period, Producer shall have the right, but not the obligation, to require Team to write the Final Draft, incorporating therein the suggestions of Producer.  If Producer exercises such right, Team shall complete and deliver the Final Draft during the period September 16 through November 15, 1994;

6.1.3.  Following delivery of the Final Draft, Producer shall have through January 2, 1995 to read the Final Draft, and to discuss possible changes and additions thereto with Team, and Team shall be available upon reasonable advance notice for such consultations by telephone.  On or before the end of said consultation period, Producer shall have the right, but not the obligation, to require Team to write the Rewrite, incorporating therein the suggestions of Producer.  If Producer exercises such right, Team shall complete and deliver the Rewrite during the period January 3 through February 2, 1995;

6.1.4.    Following delivery of the Rewrite, Producer shall have through March 5, 1995 to read the Rewrite, and to discuss possible changes and additions thereto with Team, and Team shall be available upon reasonable advance notice for such consultations by telephone. On or before the end of said consultation period, Producer shall have the right, but not the obligation, to require Team to write the Polish, incorporating therein the suggestions of Producer. If Producer exercises such right, Team shall complete and deliver the Polish during the period March 6 through April 20, 1995;

6.1.5.    To the extent Producer has not requested the writing services of Team pursuant to Paragraphs 6.1.2, 6.1.3 and/or 6.1.4 above within the time periods applicable thereto, Producer shall thereafter have the right, but not the obligation, on or before October 15, 1995 to require Team to perform such unrequested services, subject to Team's other conflicting professional commitments (it being understood that such October 15 end-date for Team's services shall be subject to Team's having timely delivered each draft of the Teleplay requested by Producer and shall be extended for a period of time equal to the duration of any such conflicting professional commitments);

6.1.6.    Team's services pursuant to this Paragraph 6.1.1 shall be non-exclusive to Producer during all writing periods (i.e., the periods within which Team must deliver each draft of the Teleplay after Producer's instruction that Team commence writing such draft) provided that none of the Team's other professional activities shall materially interfere with their obligations to Producer hereunder;

6.1.7.    If Producer wishes to have Team travel to Los Angeles or to New York for meetings during any of the above consultation periods, such meetings shall be subject to Team's reasonable availability, and the expense provisions of Paragraph 11 below shall apply.

6.2.    The executive producing services of Team shall consist of consulting in advance with Producer about the following: selection of writers, if any, other than the Team, director, principal cast, locations, composer, music and production designer for the Miniseries, and consulting with Producer in-advance about other key creative decisions in connection with production of the Motion Picture, it being understood that the decision of the Network in such matters will prevail. Such executive producing services shall be performed on a nonexclusive basis as required over the course of development and production.

7.   Grant of Rights.

7.1.    With respect to the Work, Seller hereby grants to Producer forever and throughout the world (exclusively during the current and any renewed or extended term of copyright anywhere in the world and thereafter non-exclusively) the right to produce and release one motion picture of any length based upon the Work and any and all parts thereof, including without limitation the characters contained therein (although with respect to Author Written Sequels, see Paragraph 8.10 below), for release in all media now or hereafter known (other than theatrical release), including without limitation television motion picture, videocassette, videodisc, recording, nontheatrical release of the Motion Picture or any other production permitted to be produced by Producer hereunder after its initial release in another medium, electronic, merchandising and commercial tie-up rights in and to the Work, and all rights derived therefrom or ancillary thereto to the extent expressly provided in this Agreement.

7.2.    With respect to the Teleplay, Producer has and shall have forever and throughout the world the same rights therein as Producer has in the Work, except that Lender acknowledges and agrees that for copyright purposes Team are performing Team's services hereunder after the date hereof as Producer's employee-for-hire and that all of the product of such services is a work specially ordered or commissioned for use as part of a motion picture or other audio-visual work and as such is a work-for-hire for Producer for copyright purposes, subject to the terms of this Agreement.

7.3.    Seller and Lender hereby grant exclusively to Producer forever and throughout the world the exclusive right (subject to Paragraph 19 below) to use Seller's and Team's names, approved photographs, approved likenesses and approved biographies in connection with the rights granted pursuant to Paragraphs 7.1 and 7.2 above, and in advertising and publicity in connection therewith, provided that no such use shall be as an endorsement of any product, service, entity or person other than Producer or the Motion Picture.  The right to use Team's name in connection with the Teleplay is subject to the Team's right to use pseudonyms pursuant to Paragraph 15.2 below.  Promptly after the date hereof, Seller and Team shall supply Producer with pre-approved photographs, pre-approved likenesses and pre-approved biographies, and Producer shall not use other photographs, likenesses or biographical information without Seller's or Team's, as the case may be, prior written approval, except that Producer shall have the right but not the obligation to require Seller or Team, as the case may be, to update such biographies to take into account subsequent professional information.

7.4.    Remake motion picture rights in the Work, the Motion Picture, "Return to Lonesome Dove", "Lonesome Dove" and Lonesome Dove (except, with respect to the latter three, any use in connection with the Series as defined in Paragraph 7.5 below or any spinoff weekly episodic series) are frozen in perpetuity and shall not be exercised without the mutual written approval of Seller and Producer.

7.5.    Reference is made herein to the agreement, dated March 15, 1985, between Seller and Motown Productions (the "LD Agreement") relating to "Lonesome Dove".  It is understood that Producer acquired the right, pursuant to the LD Agreement, to produce a weekly episodic television series (the "Series") with weekly episodes of up to two hours in length.  In connection with such Series or any spinoff weekly episodic series:

7.5.1.    Producer shall not have the right to use any new characters, locations or events introduced in the Work in any series other than the Motion Picture, and Producer shall not use "Streets of Laredo" or "Larry McMurtry's 'Streets of Laredo'" (or any confusingly similar title) as the title of any series other than the Motion Picture.  Seller shall have no rights to license or authorize, or to exercise himself, any television series rights based on "Streets of Laredo" or any new characters, locations or events introduced in the Work;

7.5.2.    No such series shall be an animated series;

7.5.3.    Seller's name may only appear in connection with any such series as part of the credit "Based on Characters Created by Larry McMurtry" (and with respect to any spin-off series only if such spinoff series contains characters created by Seller) on screen and in posters and one-sheets and not otherwise or elsewhere, and such credit shall in no event be larger than the credit accorded to any other individual or entity in connection with such series on such screen or in such poster or one-sheet, as applicable.

7.6.   Notwithstanding anything to the contrary in Paragraph 7.1 or 7.2 above or in the LD Agreement, Producer hereby agrees that Producer cannot exercise any remake, sequel or prequel rights (other than the original miniseries based on "Lonesome Dove", "Return to Lonesome Dove," the Motion Picture, the Series and any weekly episodic spinoff thereof) in and to Lonesome Dove or the Work.   Without limiting the foregoing, Producer agrees not to produce or authorize the production of any closed-end MOW or miniseries on a stand-alone basis, without limiting Producer's right to recut and reedit any of the productions referred to in the parenthetical in the prior sentence.

7.7.   Reference is made herein to the agreement, dated as of December 31, 1992, between Producer and Cabin Fever Entertainment ("CFE") in connection with various properties (the "CFE Agreement").   Producer represents that pursuant to the CFE Agreement, CFE has an exclusive sixty (60) day right of first negotiation with respect to the exploitation of a soundtrack album or recording substantially all of which shall be music including without limitation any singles therefrom (the "Album") based on or derived from the Motion Picture.   If Producer and CFE are unable to reach an agreement within such sixty (60) day period after commencing negotiations, Producer shall so notify Seller, and Seller shall have ten (10) business days from receipt of such notice to present to Producer a third party offer with respect to the Album.   If Producer deems such third party offer to be more favorable to Producer than the last offer made by CFE, such offer shall be submitted to CFE which, pursuant to the terms of the CFE Agreement, will have ten (10) business days to elect to acquire the rights to exploit the Album on the financial terms contained in such third party offer.   If CFE does not elect to acquire the rights to exploit the Album on the financial terms contained in such third party offer within such ten (10) business days period, Producer shall conclude an agreement on such terms with such third party.   If requested by Seller to commence such negotiations with respect to the Album with CFE, Producer shall so commence such negotiations if Producer deems it commercially and artistically reasonable to do so.   Producer represents and warrants that the CFE agreement contains a last-refusal provision the material terms of which are set forth in this paragraph above.   Producer shall grant the right to use the title of the Motion Picture, key artwork, photographs and production information in connection with the Motion Picture at no cost in connection with the Album.

7.8.   Seller shall have through January 14, 1994 to present to Producer a merchandising deal for merchandising rights to "Lonesome Dove", "Return to Lonesome Dove", and the Work, and if Producer deems such offer more favorable to Producer than the existing offer from Determined Productions, Inc., then Producer shall conclude such merchandising deal.

7.9.   If Seller, Team and/or Loeb and Loeb negotiate and arrange for an Album deal concluded by Producer pursuant to Paragraph 7.7 above or a merchandising deal concluded by Producer pursuant to Paragraph 7.8 above, then, at Producer's election, either (i) Loeb and Loeb shall document the applicable deal for a reasonable hourly rate to be paid "off the top" from the revenues generated from such Album or merchandising or (ii) Frankfurt, Garbus, Klein & Selz shall document the applicable deal for a reasonable hourly rate and Loeb and Loeb shall receive a reasonable hourly rate for its efforts in negotiating and arranging such deal, each to be paid "off the top" from the revenues generated from such Album or merchandising.

7.10.   Producer represents that it has obtained from the Network the right to release the Motion Picture in the home video market commencing sixty (60) days after its initial telecast on the Network.

7.11.   The rights to exploit an audio production containing substantially all of the soundtrack of the Motion Picture (to be distinguished from the Album) shall be frozen in perpetuity and shall not be exercised without the mutual written approval of Seller and Producer.

8.       Reserved Rights.

8.1.   Seller hereby reserves print publication rights in the Work, subject to the following:

8.1.1.   Producer shall have the right to use, and to authorize the use of, excerpts, synopses, scenarios and other versions of the Work in print publication form (each not exceeding 2,000 words in length excluding definite and indefinite articles and prepositions but in no event exceeding 2,500 words in length in total) for advertising and publicity purposes (and not for resale) in connection with the exercise by Producer of its rights hereunder;

8.1.2.   Producer shall have the right to publish, and to authorize the publication of, any "making of", production history, personal commentary, souvenir programs or similar publications, with or without illustrations, provided that (i) either the cover, the title or advertising and publicity for each of the foregoing publications shall reflect that such publication is related to, or otherwise refer to, the Motion Picture, the Series or the spin-off series, as applicable and (ii) no such publication will appear to have been written by Seller. If the Team has the right to use pseudonyms pursuant to Paragraph 15.2 below and if they have exercised such right, only their pseudonymous names shall be used in connection with any such publication.

8.2.   There shall be no novelization of the Teleplay or, notwithstanding anything to the contrary set forth in the LD Agreement or the Consultant Agreement (as defined in Paragraph 8.10 below), of the teleplays for "Lonesome Dove", "Return to Lonesome Dove" (a/k/a "Lonesome Dove II"), the Series or any spinoff series. If the Team receives sole or shared teleplay writing credit pursuant to the terms of the applicable Writers Guild of America Theatrical and Television Basic Agreement (the "Basic Agreement"), then the Team shall have the right to publish or to authorize the publication of the Teleplay; if the Team does not receive any teleplay writing credit pursuant to the terms of the Basic Agreement, the rights to publish the Teleplay shall be frozen in perpetuity and shall not be exercised without the mutual written approval of Team and Producer. Notwithstanding anything to the contrary set forth in the LD Agreement or the Consultant Agreement, the rights to publish the teleplays for "Lonesome Dove" and "Return to Lonesome Dove" shall be frozen in perpetuity and shall not be exercised without the mutual written approval of Seller and Producer.

8.3.   Seller hereby reserves all radio rights to the Work as, to the extent, and subject to the conditions set forth in Paragraphs 3(c), 3(e) and 10 of the LD Agreement.

8.4.   Seller hereby reserves all live stage (and related cast album) rights in and to the Work and the Teleplay (so long as no material found solely in the Teleplay is used in the stage play); provided, however, that (i) Seller shall not use, license, sell, assign or otherwise dispose of such rights in the United States or Canada other than to Producer until the expiration of the Network license period for the Motion Picture and (ii) Seller shall not be entitled to exploit any motion picture, television or allied rights (including merchandising) in any such live stage productions based on the Work.

8.5.   Notwithstanding anything to the contrary contained in Paragraphs 3(b), 3(e) and 10 of the LD Agreement,

Seller hereby reserves all live stage (and related cast album) rights to <u>Lonesome Dove</u> and the "Lonesome Dove" teleplay (so long as no material found solely in such teleplay is used in the stage play); without any holdbacks; provided, however, that Seller shall not be entitled to exploit any motion picture, television or allied rights (including merchandising) in any such live stage production based on <u>Lonesome Dove</u>.

8.6.    Seller hereby reserves electronic publishing rights in and to the text of the Work; provided, however, that Seller shall not have the right to dramatize the Work in any manner in connection with such electronic publishing, and Producer shall have the right to exploit the Motion Picture in all CD-ROM and similar formats.

8.7.    Seller hereby reserves single voice non-dramatic reading rights in and to the Work.

8.8.    Seller hereby reserves all rights in and to the Work not specifically granted to Producer herein.

8.9.    Nothing in this Agreement restricts Seller's or Team's rights in and to any future literary works in the Western genre written by him or them, as applicable, all rights in such literary works being reserved to Seller or Team, as applicable (subject to Paragraph 8.10 below).

8.10.    Reference is made herein to Paragraph 10 of the agreement, dated as of March 18, 1991, between Producer and Seller in connection with "Return to Lonesome Dove" (a/k/a "Lonesome Dove II") (the "Consultant Agreement").  It is understood that Seller has reserved the right to write author written sequels and prequels using characters from the novel on which the Initial Mini-Series (as defined in the Consultant Agreement) was based, and it is further understood that nothing in this Agreement limits or alters such rights.  By way of clarification, the rights reserved by Seller pursuant to Paragraph 10 of the Consultant Agreement include, without limitation, any prequels or sequels written by Seller to the novel on which the Initial Mini-Series is based, and the term "Author Written Sequels" as used in the Consultant Agreement shall be deemed to include any such prequels or sequels (which prequels or sequels shall be subject to the same Restricted Period (as defined in the Consultant Agreement) and right of first negotiation/matching last refusal with respect to motion picture, television and/or allied rights as such sequels).  Furthermore, for purposes of Producer's ability to extend such Restricted Period by producing sequels (subject to the proviso that the only Producer sequels permitted are Lonesome Dove II (already produced), the Series and spin-offs to the Series) or Series episodes, prequels and sequels shall also refer to any prequel or sequel based on any Author Written Sequel for which Producer has acquired motion picture, television and allied rights (including, without limitation, the Work).  For purposes of calculating the Restricted Period, the seven years referred to in such Paragraph 10 shall, upon execution hereof by Seller, be deemed five (5) years.  .

8.11.    It is understood and agreed that whatever rights are reserved to Seller and/or Team pursuant to this Agreement may be exercised by Seller and/or Team, as applicable, or their assignees, designees or licensees, subject to the terms and conditions of this Agreement.

9.    <u>Compensation</u>.

9.1.    In full and complete consideration to Seller for the rights granted under Paragraphs 7.1 and 7.3 above, Producer shall pay to Seller on a "pay or play" basis the following amounts:

9.1.1.    An amount equal to $325,000,

9.1.2.    An amount equal to $325,000, payable upon delivery of the Final Draft pursuant to Paragraph 6.1.2 but not later than December 1, 1994 (provided that such December 1 date is subject to Team having delivered the First Draft on a timely basis pursuant to Paragraph 6.1.1 above and the Final Draft (if requested) on a timely basis pursuant to Paragraph 6.1.2 above);

9.1.3.    Seller hereby acknowledges and agrees that payments to Seller pursuant to this Paragraph 9.1 are in lieu of any amounts which might otherwise be payable to Seller pursuant to Paragraph 7 of the LD Agreement with respect to the Motion Picture produced hereunder based upon the Work.

9.2.    In full and complete consideration to Lender for entering into and performing and causing Team to perform its and their respective obligations hereunder, and further provided that Lender and Team have completely performed their respective material obligations hereunder, Producer shall pay to Lender an amount equal to $600,000 on a pay-or-play basis (with Team having no obligation to mitigate Producer's damages and Producer having no right of offset with respect to moneys Team may otherwise earn during the period they would have been performing services hereunder, without limiting Producer's rights in the event Team is in material breach of any of its obligations hereunder), as follows:

9.2.1.    An amount equal to $150,000, payable on February 1, 1994 provided Team has commenced writing the First Draft by such date;

9.2.2.    An amount equal to $150,000, payable on July 1, 1994 provided that Team has delivered the First Draft on a timely basis;

9.2.3.    An amount equal to $ 150,000, payable on November 15, 1994, provided that Team has delivered the Final Draft (if requested by Producer) on a timely basis (but in any event on such date if Producer has not requested Team to write the Final Draft in accordance with the applicable time periods set forth in Paragraph 6.1.2 above);

9.2.4.    An amount equal to $ 75,000, payable on February 2, 1995, provided that Team has delivered the Rewrite (if requested by Producer) on a timely basis (but in any event on such date if Producer has not requested Team to write the Rewrite in accordance with the applicable time periods set forth in Paragraph 6.1.3 above);

9.2.5.    An amount equal to $ 75,000, payable on April 20, 1995, provided that Team has delivered the Polish (if requested by Producer) on a timely basis (but in any event on such date if Producer has not requested Team to write the Polish in accordance with the applicable time periods set forth in Paragraph 6.1.4 above);

9.3.    On execution hereof, Producer shall pay to Seller a non-applicable amount equal to $37,000.

9.4.    Notwithstanding anything to the contrary set forth in this Paragraph 9, if Producer exercises its "pay or play" rights with respect to Team's writing services or if the Motion Picture is abandoned, cancelled or terminated for any reason, including, without limitation, force majeure, any amounts pursuant to Paragraphs 9.1 and 9.2 above which have not been paid shall be paid at such time.

10.    Contingent Payments.  If the following events occur, and provided Seller, Lender and Team have completely performed their respective material obligations requested by Producer hereunder, Seller or Lender, as applicable, shall be entitled to receive the following contingent payments:

10.1.   If the Motion Picture exceeds six (6) hours in running time, Seller shall be entitled to receive an amount equal to $100,000 for each hour of running time over six (6) hours, up to a maximum payment pursuant to this Paragraph 10.1 and Paragraph 9.1 above of $1,000,000 in the aggregate.  Any amounts payable pursuant to this Paragraph 10.1 shall be payable on completion of principal photography of the Motion Picture;

10.2.   If the Motion Picture exceeds six (6) hours in running time:

10.2.1.  Lender shall be entitled to receive an amount equal to $100,000 for each hour of running time over six (6) hours written by Team pursuant to Paragraph 6.1 above (i.e., if no additional writing services are required beyond Team's services pursuant to Paragraph 6.1 above), up to a maximum payment pursuant to this Paragraph 10.2.1 and Paragraph 9.2 above of $1,000,000 in the aggregate.  Any amounts payable pursuant to this Paragraph 10.2.1 shall be payable on completion of principal photography of the Motion Picture;

10.2.2.  The Team shall have no obligation to perform additional writing services to expand the Motion Picture beyond six (6) hours, provided that if writing services in addition to those performed under Paragraph 6.1 above are required and if no writers other than the Team have been engaged as of the date such additional writing services are required, the Team shall be offered the first opportunity to perform such additional writing services at $100,000 for each additional hour of the Motion Picture to be written beyond six (6) hours; if Team elects to exercise such right of first opportunity, they shall so notify Producer within five (5) business days after receipt of Producer's written request for such services specifying the dates such services are to be performed, with failure within such 5 business days period to accept such offer to perform services being deemed an election by Team not to perform such services. If Team elects to exercise such right of first opportunity in accordance with this Paragraph 10.2.2, Team shall be "pay or play" for such additional writing services upon such election and shall be paid for such additional writing services fifty percent (50%) upon Team's commencement of writing such additional material and fifty percent (50%) upon Team's delivery of such additional material. If the Motion Picture is expanded beyond six (6) hours solely by reason of the Teleplay written by Team pursuant to Paragraph 6.1 above and if writing services in addition to those performed under Paragraph 6.1 above are required (and if no writers other than the Team have been engaged as of the date such additional writing services are required), the Team shall be offered the first opportunity to perform such additional writing services as set forth above and will also be entitled to receive the applicable payments set forth in Paragraph 10.2.1. above for that portion of the Motion Picture expanded beyond six hours solely by reason of the Teleplay written by Team pursuant to Paragraph 6.1 above, it being understood that the $1,000,000 cap set forth in Paragraph 10.2.1 above applies only to that portion of the Motion Picture expanded beyond six hours solely by reason of the Teleplay written by Team pursuant to Paragraph 6.1 above.  For example, if the Teleplay written by Team pursuant to Paragraph 6.1 above is expanded into an eight (8) hour Motion Picture without additional writing services, and if in addition (i) Team is engaged to write two (2) additional hours of the Motion Picture, Lender shall be entitled to receive $200,000 pursuant to Paragraph 10.2.1 above and $200,000 pursuant to this Paragraph 10.2.2 or (ii) Team is engaged to write four (4) additional hours of the Motion Picture, Lender shall be entitled to receive $200,000 pursuant to Paragraph 10.2.1 above and $400,000 pursuant to this Paragraph 10.2.2.;

10.3.   If the Motion Picture is released, or rights derived from the Teleplay are exploited, in any medium

(other than as set forth in Paragraphs 10.5, 10.6 and 10.8 hereof), including without limitation if the Motion Picture has more than one run on free television in the United States or Canada, requiring payment of additional compensation to Team pursuant to the Basic Agreement, with respect to each or any such release or exploitation, Lender shall be entitled to receive the minimum amounts required by the Basic Agreement.  There shall be no crediting of any overscale payments against any such minimum amounts.  There shall be no theatrical release of the Motion Picture without first agreeing on and paying mutually agreed additional compensation to Seller with respect to the Work and additional compensation to the Team in connection with such theatrical release;

10.4.   Producer shall pay to Seller an amount equal to 10% of 100% of the Net Profits from the Motion Picture, calculated, accounted for and paid in accordance with the terms of Exhibit A attached hereto and incorporated herein by reference subject to mutual good faith negotiation, and further subject to Paragraph 10.7 below.  If Team receives writing credit in connection with the Teleplay for the Motion Picture, Producer shall pay to Team an amount equal to 10% of 100% of such Net Profits, reducible by the amounts measured by Net Profits paid to subsequent writers in connection with the Motion Picture to a floor of 5% of 100% of such Net Profits if Team shares writing credit for the Motion Picture with one or more subsequent writers other than the two members of the Team;

10.5.   Producer shall account to Seller separately for an amount equal to fifty percent (50%) of any amounts collected by, or credited to, Producer from the license or exercise of rights in the Album or any singles or videos, which amounts shall not be cross-collateralized with any other amounts generated from the exploitation of any other rights in connection with the Motion Picture.  If Seller is able to bring to Producer a better merchandising agreement which Producer concludes pursuant to Paragraph 7.8 above, then Producer shall pay to Seller an amount equal to one-third of the amounts collected by, or credited to, Producer from such merchandising agreement; if Seller does not bring such agreement to Producer or if Producer elects not to enter into such agreement, Producer shall account to Seller for one-quarter of the amounts collected by, or credited to, Producer from merchandising agreements relating to "Lonesome Dove", "Return to Lonesome Dove", "Lonesome Dove: The Series" or the Work, which amounts shall not be cross-collateralized with any other amounts generated from the exploitation of any other rights in connection with the Motion Picture.  Non-refundable advances received in connection with the exploitation of the Album or any merchandising pursuant to this Paragraph 10.5 shall be subject to accountings pursuant to this Paragraph 10.5 as and when received.  Seller shall be entitled to direct accountings and direct audit rights with respect to the Album, and third party costs shall be deducted off-the-top.  Accountings pursuant to this Paragraph 10.5 with respect to merchandising shall deduct third party costs off-the-top and shall be sent with the accountings for amounts payable pursuant to Paragraph 10.4 above but commencing with the first quarter in which any revenues are received pursuant to a merchandising agreement and shall be subject to the same auditing rights and limitations as set forth in Exhibit A;

10.6.   With respect to the Series, the Producer shall pay to the Seller, in lieu of any amounts payable to Seller pursuant to the LD Agreement or otherwise and inclusive of any amounts payable to the Team pursuant to the Basic Agreement a royalty in an amount equal to $3,000 per 60 minute episode (pro rata up or down for any episode longer or shorter than 60 minutes), payable upon commencement of principal photography of each such episode, plus an amount equal to 5% of 100% of the Net Profits from the Series.  With respect to the initial broadcast season of the Series, Seller shall be entitled to receive the

foregoing royalty for twenty-one (21) episodes of the Series, and if the Series is abandoned, cancelled or terminated for any reason, including, without limitation, force majeure, the balance of the unpaid royalties for such twenty-one (21) episodes shall be due and payable at such time.  With respect to subsequent broadcast seasons of the Series, Seller shall only be entitled to the royalty set forth herein for Series episodes actually produced; provided, however, that if Producer receives any monies with respect to unproduced episodes beyond what is necessary to cover Producer's costs and expenses for such unproduced episodes, Seller shall be entitled to receive the royalty set forth herein with respect to such unproduced episodes.  With respect to any spin-off series containing a continuing character created by Seller, the Producer shall pay to the Seller, in lieu of any amounts payable to Seller pursuant to the LD Agreement or otherwise and inclusive of any amounts payable to the Team pursuant to the Basic Agreement a royalty in an amount equal to $1500 per sixty minute episode (pro rata up or down for any episode longer or shorter than sixty minutes), payable upon commencement of principal photography of each such episode, plus an amount equal to 2 1/2% of 100% of the Net Profits from such spin-off series.  Net Profits from the Series and any spin-off series shall be calculated, accounted for and paid in accordance with the provisions of Exhibit A attached hereto and incorporated by reference herein subject to good faith negotiations and further subject to Paragraph 10.7 below, except that the Series shall be substituted for the Motion Picture in such definition, losses in one production season shall be deductible from profits in subsequent seasons (it being understood that there shall be no-cross collateralization among the Series and any spin-off series), and revenues from any episodes of the Series or any spin-off series which are combined and sold to a network shall be credited to gross receipts;

      10.7.    In all calculations of Net Profits:

         10.7.1.    Producer's overhead fee shall be limited to six percent (6%) of direct costs;

         10.7.2.    Interest on the amounts actually spent by Producer on the development and production expenses of the Motion Picture shall be charged at the actual effective rate paid by Producer to its principal lenders.  For the purposes of calculating interest pursuant to this Paragraph 10.7.2., the amounts collected by Producer from advances, license fees and other receipts derived from the exploitation of rights in the Motion Picture shall as of the date collected by Producer stop the running of interest charges on an equivalent portion of such development and production expenses of the Motion Picture;

         10.7.3.    There shall be no separate production fee to Producer and the only fee charged for employees of Producer or any of its affiliates shall be a fee not to exceed $75,000 per hour of the Motion Picture for the combined services of Robert Halmi, Sr. and Robert Halmi, Jr.;

         10.7.4.    There shall be no distribution fee on the Network license fee for the Motion Picture and such Network license fee shall be included in gross receipts as and when received by, or credited to, Producer;

         10.7.5.    All non-refundable advances in connection with the exploitation of the Motion Picture or rights derived therefrom shall be included in gross receipts as and when received by, or credited to, Producer;

         10.7.6.    Producer's distribution override with respect to any medium or territory for which Producer is not the direct distributor of the Motion Picture shall be limited to five percent (5%) of Producer's receipts from the direct distributor;

10.7.7.   If Producer acts as completion guarantor of the Motion Picture, Producer shall not charge any completion fee;

10.7.8.   The revenues and expenses generated by any "making of" production shall be included in gross receipts;

10.7.9.  All fees and agreements shall be at arm's length;

10.7.10.  95% of 100% of all revenues received by, or credited to, Producer from the exploitation of home video rights in the Motion Picture shall be included in gross receipts with no further distribution fee or override and all non-refundable home video advances shall be included in gross receipts as and when received by, or credited to, Producer;

10.7.11.  Music publishing revenues received by, or credited to, Producer (as opposed to the revenues actually paid to the composer) shall be included in gross receipts with no distribution or administration fee to Producer;

10.7.12.  Producer shall furnish Seller and Team with accountings quarterly for the first three (3) years after the Motion Picture, Series or any spin-off series (as applicable) is initially released, semi-annually for the next five (5) years, and annually thereafter;

10.8.   If Producer exercises any of the print publication rights pursuant to Paragraph 8.1.2 above, or if the Team exercise any of the print publication rights pursuant to Paragraph 8.2 above, the recipient of amounts collected from such exercise shall account to the other for an amount equal to fifty percent (50%) of the amounts so collected, with third party fees and expenses deducted off-the-top.  Accountings shall be made in accordance with the terms and conditions of Paragraph 6 of Exhibit A attached hereto and incorporated by reference herein.

10.9.   Notwithstanding anything to the contrary set forth in this Agreement, there shall be no cross-collateralization among or between the Motion Picture, the Series, any spin-off series and any of Producer's other productions;

10.10.  If Producer distributes the Motion Picture, Series or spin-off series with any other productions, there shall be a reasonable allocation of revenues and expenses generated by such Motion Picture, Series or spin-off series (as applicable) and such other productions.

11.   Expenses.  If Producer requires Team to render services hereunder at a place or places more than 50 miles from such person's residence, or such person's then location if closer to the place services are to be performed, Producer will furnish each person with one (1) round-trip transportation ticket (first class and by air, if available and if used) to wherever Producer requires such person to render such services and with exclusive airport/hotel and hotel/location of services transportation, and Producer will supply Team with a first-class two-bedroom hotel suite if available (room rate and related taxes only), or, if not available, with a first-class one-bedroom hotel suite (if available) and an adjacent first class hotel room (room rate and related taxes only) and with a per diem of $150 each per day in major cities such as New York and Los Angeles, and $100 each per day elsewhere.  The Team shall each have the right to one such roundtrip ticket and to the other provisions hereof during principal photography of the Motion Picture.  The provisions of this Paragraph 11 are in lieu of any other obligations with respect to Team's expenses while at such place or places.

12. Representations and Warranties.

12.1. Lender hereby represents and warrants as follows:

12.1.1. Subject to Article 28 of the Basic Agreement: All of the product of Team's services hereunder will be written by and be original with Team and not based on any material other than the Work; and the product of Team's services hereunder will not violate, conflict with, or infringe upon any rights whatsoever (including, without limitation, any copyright, common law or statutory, throughout the world; any right of publication, performance, or any other right in any work; and any right against libel, slander, invasion of privacy of similar right) of any person, firm or corporation;

12.1.2. Lender has and will continue to have the right to enter into and to perform this Agreement, and to grant all rights granted hereunder.

12.2. Seller hereby represents and warrants as follows:

12.2.1. The Work is fictional; no portion of the Work has been taken from any other work (other than 'Lonesome Dove') and there has been no claim that the Work violates, conflicts with, or infringes upon, and the Work does not violate, conflict with or infringe upon, any rights whatsoever (including, without limitation, any copyright, common law or statutory, throughout the world; any right of publication, performance, or any other right in any work; and any right against libel, slander, invasion of privacy or similar right) of any person, firm or corporation;

12.2.2. Seller has the right to enter into and to perform this Agreement and to grant all rights granted hereunder with respect to the Work. Seller is the sole and exclusive owner throughout the world of the rights herein granted to Producer with respect to the Work and has the right to grant such rights exclusively to Producer, and no claim has been made that Seller does or may not have such right or rights. There is not now valid or outstanding, and Seller will not hereafter grant, any right in connection with the Work which is or would be adverse to, or inconsistent with, or impair, the rights herein granted to Producer;

12.2.3. The Work was first published by _____ on _____ 19__, and copyright in the Work was registered in the United States Copyright Office under date _____, 19__, Registration Number _____ . The Work is protected by or subject to protection by copyright in the United States and in those countries which are signatory or adhere to the Universal Copyright Convention and is not in the public domain anywhere in the world where copyright protection is available.

12.3. Producer hereby represents and warrants that it has the right to enter into and perform this Agreement, including without limitation insofar as rights to Lonesome Dove are concerned, and that it is the sole successor to Quintex Entertainment Inc. pursuant to an Asset Sale and Purchase Agreement dated as of September 11, 1990 between Quintex Entertainment Inc. and Producer.

13. Indemnities.

13.1. Seller shall indemnify and save harmless Producer, its successors, licensees and assigns, and any representatives thereof, against any and all claims and expenses (including without limitation reasonable outside legal fees and expenses) incurred by any of them by reason of the breach of any

warranty or representation made or entered into herein or hereunder by Seller.

13.2.    Lender shall indemnify and save harmless Producer, its successors, licensees and assigns, and any representatives thereof, against any and all claims and expenses (including without limitation reasonable outside legal fees and expenses) incurred by any of them by reason of the breach of any warranty or representation made or entered into herein or hereunder by Lender or Team.

13.3.    Producer shall indemnify and save harmless Seller, Lender and Team, and their respective successors and assigns, and any representatives thereof, against any and all claims and expenses (including without limitation reasonable legal fees and expenses) incurred by any of them by reason of (a) the breach of any warranty or representation made or entered into herein or hereunder by Producer or (b) the development, production, or distribution of the Motion Picture (including without limitation material added to the Teleplay or changes in the Teleplay by the Producer or at the Producer's request), except to the extent the claim or expense arises from a breach by Seller, Lender or Team of their respective representations and warranties hereunder.  Producer shall add Seller, Lender, and Team as additional named insureds on Producer's errors and omissions and general liability policies covering the Motion Picture, and copies of certificates of such insurance shall be supplied to Seller, Lender and Team after such insurance policies are obtained by Producer (and Producer shall obtain such policies at the time it customarily does so prior to commencement of principal photography of the Motion Picture).

14.   <u>Payola</u>.  Seller and Lender understand that it is a Federal offense, unless disclosed to Producer prior to broadcast, to:

14.1.    Give or agree to give any member of the production staff, anyone associated in any way with the Motion Picture or any representative of any sponsor(s) of the Motion Picture any portion of Seller's or Lender's compensation or anything else of value for arranging Team's services to be furnished for the Motion Picture;

14.2.    Accept or agree to accept anything of value, other than Seller's and Lender's compensation and contingent payments, if any, hereunder, for services relating to the Motion Picture to promote any product, service or venture on the air, or use any prepared material containing such promotion where Seller or Lender know that the writer of such material received compensation for it.

15.   <u>Credit</u>.

15.1.    If the Motion Picture is produced, Seller shall receive credit on the screen, video packaging, recordings, merchandising (where other credits appear) and in paid advertising, promotion and publicity for the Motion Picture issued by or under the control of Producer, as follows:

15.1.1.    Wherever the title of the Motion Picture appears in the English language (including without limitation in voice-over on air promotional spots), such title shall be:  "Larry McMurtry's 'Streets of Laredo", and in such title in visual form, "Streets of Laredo" shall be the same artwork logo as is used for the Work provided that Seller is able to deliver to the Producer promptly after the execution hereof a written transfer or authorization from the creator of such logo permitting such use for the Motion Picture and rights derived therefrom, and in advertising, publicity and on-air promotion in connection therewith, in all media now or hereafter known

throughout the world in perpetuity at no cost or charge to Producer; and

        15.1.2.   Wherever the screenwriter(s) receive(s) credit, in a size of type equal to the size of type of the billing for the screenwriter(s) of the Motion Picture, substantially as follows:  "Based on the novel by Larry McMurtry".  On screen, such credit shall be on a separate card.

        15.2.   If the Motion Picture is produced, Team shall receive credit on the screen and in paid advertising, promotion and publicity (other than awards, prizes or congratulatory ads) as and to the extent required by the Basic Agreement.  Wherever Seller's name appears as a writer of the teleplay, Ossana's name shall also appear.  Notwithstanding the foregoing, if pursuant to the Basic Agreement, the Team is to share writing credit with any other writers, the Team shall have the right (to be exercised jointly) but not the obligation to elect by written notice to the Producer, sent to the Producer within five business days after the Team has received written notice of the final writing credits as determined pursuant to the Basic Agreement, to use WGA registered and approved pseudonyms for their respective writing credits.

        15.3.   The Team shall also receive a shared "Executive Producer" credit on screen among the main titles and in paid advertising, promotion and publicity issued by or under the control of Producer wherever any other executive producer credit appears in a size of type not less than the size of type of the credit accorded to any other individual or company in connection with the Motion Picture except principal cast and logos. On screen, such executive producer credits for McMurtry and for Ossana shall appear on the same card, but no other credits shall appear on such card.

        15.4.   If a soundtrack album or recording agreement has been entered into by Producer by the date end credits for the Motion Picture are set, such end credits for each installment of the Motion Picture shall include a credit reflecting that the soundtrack album or recording is available on the specified label, and Producer represents and warrants that the Network has agreed to the foregoing.

        15.5.   Except as specifically set forth herein, all other decisions with respect to Seller's and Team's credits, including without limitation the position, size, prominence, style, placement and form of any and all credits, shall be determined by Producer in its sole discretion.

        15.6.   Producer shall contractually obligate third party distributors and licensees (other than the Network, except that the Network has agreed that the title "Larry McMurtry's 'Streets of Laredo'" shall be the title of the Motion Picture and will be used in all Network advertising, promotion (including without limitation in voice-over on air promotional spots) and publicity) to comply with the credit provisions set forth in this Paragraph 15.  No casual or inadvertent failure of Producer to comply with the provisions of this Paragraph 15, and no failure of any other party to comply with such obligations, shall constitute a breach of this Agreement by Producer.  Upon receipt of written notice from Seller or Team of any failure by Producer to comply with the credit provisions of this Paragraph 15, Producer shall use reasonable efforts to cure prospectively any such failure to comply with respect to future paid advertising or publicity created, if any, after Producer's receipt of such notice or future prints made, if any, after Producer's receipt of such notice and after the first run of the Motion Picture on the Network.

        15.7.   Notwithstanding anything to the contrary set forth in this Agreement, if Producer exercises its "pay or

play" rights with respect to Team's writing services and Team does not receive any writing credit in connection with the Motion Picture, Team shall be entitled to elect not to receive executive producing credit pursuant to Paragraph 15.3 above in connection with the Motion Picture in accordance with this Paragraph 15.7. Within ten (10) business days after Team has received written notice of the final writing credits for the Motion Picture as determined pursuant to the Basic Agreement, Team shall notify Producer whether or not they elect to receive such executive producing credit; any failure to notify Producer within such period shall be deemed an election not to receive executive producing credit.

16.   _Producer's Control_.  Seller, Lender and Team acknowledge the right of Producer to make any changes in the Work and in the product of any of Team's services hereunder in the preparation and exploitation of any productions based upon or incorporating the Work and such product, and in this connection Seller, Lender and Team acknowledge and agree that none of them will have any right of approval (although the Team shall have consultation rights in connection with their services pursuant to Paragraph 6.2 above) with respect to any such changes or with respect to any element (casting, screenplay, directing, distribution, etc.) of any productions produced hereunder. Without limiting the generality of the foregoing sentence, Producer shall have all artistic control over and the right to cut, edit, add to, subtract from, arrange, rearrange and revise the Work and the product of any of Team's services hereunder in any manner.  Producer shall not be obligated to produce or release the Motion Picture or any other production based upon the Work and/or the Teleplay, or to continue such production or release if commenced; but nothing in this Paragraph 16 shall be deemed to relieve Producer of its obligation to pay the compensation set forth in Paragraph 9 above, and in Paragraph 10.2.2 above if Team has been engaged on a "pay or play" basis pursuant thereto, at the times and in the manner therein provided, and, if the Motion Picture is produced, the additional compensation set forth in Paragraph 10 above, at the times and in the manner therein provided and subject to the terms and conditions set forth therein.

17.   _Cassettes; Screenings._  Producer shall supply to each of Team either a half-inch or three-quarter inch VHS copy or Beta copy of the Motion Picture, at each of Team's election (adequate notice of the format desired by each of Team shall be supplied to Producer), upon delivery of the Motion Picture to the Network.  Producer shall also invite each of Team to all invitational screenings or premieres of the Motion Picture and if the Team or either of them attend, the provisions of Paragraph 11 above shall apply.

18.   _Guild Payments_.  To the extent required of Lender in connection with Team's services hereunder and the amounts payable by Producer in connection therewith, Producer shall pay directly to the Pension Plan, and the Health and Welfare Plan, contributions pursuant to the Basic Agreement, provided that in no event shall the amount paid by Producer hereunder exceed the payments that would have been paid by Producer had Producer employed Team directly.

19.   _Remedy for Breach by Producer_.  Provided Producer has paid the amounts required pursuant to Paragraphs 9.1, 9.2 and 10.2 above, Seller, Lender and Team recognize that in the event of a breach by Producer of its obligations under this Agreement (including, without limitation, breaches of credit obligations), the damage (if any), caused to Seller, Lender and/or Team thereby is not irreparable or sufficient to entitle Seller, Lender and/or Team to injunctive or other equitable relief.  Seller, Lender and Team, therefore, agree that after such payments pursuant to Paragraphs 9.1, 9.2 and 10.2 have been made their rights and remedies shall be limited to the right, if any, to obtain damages

at law and an accounting and that none of them shall have the right to terminate or rescind this Agreement or to enjoin or restrain the distribution or exhibition of the Motion Picture. Neither the expiration of this Agreement nor any other termination thereof shall affect the ownership by Producer of the results and proceeds of the services supplied by Team, or any other rights granted herein to Producer, or alter any of the rights or privileges of Producer, or any warranty or undertaking on the part of Seller, Lender or Team in connection with such results and proceeds.

20. _Assignment_. Producer may assign its rights hereunder to any person, firm or corporation, provided, however, that Producer shall not be released from any of its obligations hereunder to Lender or Seller unless the assignee is a major or minimajor or a network, which assumes in writing all of such obligations, including, without limitation, the obligation to pay directly to Seller and Team any amounts due pursuant to Paragraphs 9 and 10 above and a provision for direct accounting and direct audit rights to the extent set forth herein, and provided further that Producer shall not assign this agreement during development or production of the Motion Picture unless Robert Halmi, Sr. and/or Robert Halmi, Jr. continue to be actively involved with the development and production of the Motion Picture.

21. _Notices_. Payments and notices shall be sent to Seller and Lender at their respective addresses set forth above, and notices to Producer shall be sent to it at its address set forth above, or to such other addresses as Producer or Seller or Lender may hereafter give in such manner. Copies of all notices to be given to Producer shall be sent concurrently and by the same method of transmission to Frankfurt, Garbus, Klein & Selz, P.C., 488 Madison Avenue, New York, New York 10022, Attn: Thomas O. Selz, Esq. and Jill N. Goldstein, Esq. Copies of all notices to be given to Seller or to Team shall be sent concurrently and by the same method of transmission to any agent for Seller and Team of whom Producer is notified.

22. _Miscellaneous_. This Memorandum Agreement shall be deemed made in New York State and shall be construed in accordance with the laws of New York State applicable to contracts entirely made and performed therein. Long-form agreements will be entered into if requested by Producer containing other terms and conditions standard in the motion picture and television industry but not inconsistent with the terms hereof and subject to mutual good faith negotiation taking into account Seller's and Team's respective statures in the industry (it being understood that, subject to the terms hereof, such other terms and conditions are intended to govern the rights and obligations of the parties hereto), including, without limitation, terms relating to force majeure, illness, default (it being agreed that Lender and Team, on the one hand, and/or Seller, on the other hand, as the case may be, shall have two business days from receipt of written notice to cure any alleged breach or default hereunder on a one-time only basis with respect to each of Seller, on the one hand, and Lender and Team on the other hand), completion of services, wage stabilization, conformity to law, collective bargaining agreements, cast

insurance, etc.  Until long-form agreements are executed, if ever, this Memorandum Agreement constitutes a complete and mutually binding agreement.

Dated:  As of August 20, 1993

PRODUCER:

RHI ENTERTAINMENT, INC.

By: _____
Authorized Officer

LENDER:

SARIA COMPANY, INC.

By: _____
Authorized Officer

SELLER:

_____
Larry McMurtry

        In order to induce Producer to enter into the foregoing Memorandum Agreement with Lender, and for other good and valuable consideration receipt of which is hereby acknowledged, the undersigned hereby represents and warrants that the undersigned is familiar with each term and condition of the foregoing Memorandum Agreement, and the undersigned hereby consents and agrees to the execution and delivery of said Agreement by Lender and hereby agrees to render all the services therein provided to be rendered by the undersigned, to grant all the rights granted therein, and to be bound by and duly perform and observe each and all the terms and conditions of said Agreement requiring performance or compliance on the part of the undersigned, and hereby joins in all warranties, representations, agreements and indemnities made by Lender, and further confirms the terms of Paragraph 16 of the Agreement and hereby waives any rights which the undersigned may have. The undersigned further waives any claim against Producer for wages, salary or other compensation of any kind pursuant to said Agreement or in connection with the Motion Picture and the exercise by Producer of rights therein or derived therefrom (provided, however, that such waiver shall not relieve Producer of any of its obligations to Lender under the foregoing Memorandum Agreement), and the undersigned agrees that the

<u>A S S I G N M E N T</u>

KNOW ALL MEN BY THESE STANDARD

THIS INSTRUMENT is subject to all the terms and conditions of the Memorandum Agreement (which Memorandum Agreement shall control to the extent inconsistent with any terms hereof), dated as of August 20, 1993, between RHI ENTERTAINMENT, INC. (referred to herein as "Producer"), and LARRY McMURTRY (referred to herein as "Seller") AND SARIA COMPANY, INC. relating to the literary work (the "Work") entitled *Streets of Laredo* written by Seller.

The undersigned Seller, for One Dollar in hand paid and for other valuable consideration now received, hereby sells forever and throughout the world the right to produce and release one motion picture of any length based upon the Work, and any and all parts thereof, including without limitation the characters contained therein (subject to the terms of said Memorandum Agreement with respect to Author Written Sequels), for release in all media now or hereafter known (other than theatrical release), including without limitation television motion picture, videocassette, videodisc, recording, nontheatrical release of such Motion Picture or any other production permitted to be produced by Producer after its initial release in another medium, electronic, merchandising and commercial tie-up rights in and to the Work, and all rights derived therefrom or ancillary thereto (collectively, the "RIGHTS").

The undersigned agrees, insofar as the undersigned now or later may have the power or authority so to do, to cause renewals or extensions of any copyright in the Work duly to be obtained, and the RIGHTS herein granted are now assigned to Producer for the renewal or extended term of copyright and after such renewal or extension further or like documents of confirmation of assignment will be given to Producer if requested. The undersigned hereby appoints Producer as irrevocable attorney-in-fact, with the right, but not the obligation, to execute and file all such documents (if not executed by the undersigned within five (5) business days of the undersigned's receipt of such documents) and to do all acts reasonably necessary for the obtaining of such extensions or renewals and evidencing the continuation of the same rights in Producer for such renewed or extended terms as are now vested in Producer.

A copy of any such document executed by Producer shall be promptly supplied to the undersigned.

And the said Producer, and its successors and assigns, are hereby empowered to bring, prosecute, defend and appear in suits, actions and proceedings of any kind or nature under or concerning said copyright, or concerning any infringement thereof, and particularly infringement of or interference with any of the RIGHTS now granted under said copyright, in the name of Producer which will indemnify the undersigned therein. Any recovery from infringement or violation of any copyright or its renewals or extensions, so far as it arises from any violation of the RIGHTS hereby assigned, is now assigned to and shall be paid to said Producer and its successors and assigns to become part of the gross receipts of the Motion Picture without any distribution fee and with the costs of obtaining such recovery (including without limitation any outside professional fees and expenses) shall be a distribution expense of the Motion Picture.

Dated:  As of August 20, 1993

Larry McMurtry

STATE OF Arizona       )
                       )   ss.:
COUNTY OF Pima         )

     On this 15th day of December , 1993, before me came
Larry McMurtry, to me known to be the individual described in and
who executed the foregoing instrument, and duly acknowledged that
he executed the same.

Gina M. King
Notary Public

My Commission Expires March 4, 1997

Exhibit "A"

RHI ENTERTAINMENT, INC.

Definition Of Net Profits

The terms of this Exhibit and Schedule I thereto are part of and are incorporated in the Agreement, dated as of August 20, 1993, between LARRY MCMURTRY individually and the team of LARRY MCMURTRY and DIANA OSSANA, on the one hand (together the "Participants") and RHI ENTERTAINMENT, INC. on the other hand (the "Producer"), relating to a possible television motion picture entitled "Larry McMurtry's 'Streets of Laredo'" (the "Picture").

1.    Definition of Net Profits.

1.1.    The term "Net Profits" from the Picture as used herein shall mean the "Gross Receipts" (as defined in Paragraph 2 below) remaining after the deduction therefrom on a continuing basis of the "Distribution Fees" (as defined in Paragraph 3 below), the "Distribution Expenses" (as defined in Paragraph 4 below) and the "Production Expenses" (as defined in Paragraph 5 below).

1.2.    Notwithstanding anything to the contrary herein, if the Producer enters into an agreement with a person, firm or corporation who provides the financing, production, sale and/or distribution of the Picture and such agreement contains a definition of "Net Profits" and/or provisions for accounting and payment thereof which are different from those provisions contained herein, such definition and provisions in such other agreement shall at the Producer's election be substituted for those provisions contained in this Exhibit A.

2.    Gross Receipts.    The "Gross Receipts" from the Picture shall be deemed to mean the following:

2.1.    There shall be included the actual gross payments collected in the United States in United States dollars by (a) the unaffiliated distributor of the Picture to whom the Producer has granted distribution rights in and to the Picture, or (b) the Producer or an affiliated distributor if the Producer or such affiliate itself distributes the Picture, in any medium now or hereafter known, or (c) the Producer from the exploitation of music recording and publishing, print publication, and/or merchandising rights in the Picture;

2.2.    There shall not be included any of the following:

2.2.1.    The receipts of any television network or stations, theatre, or any other exhibitor or user of the Picture, or rights therein or derived therefrom in any medium, and only the license fee or rental paid by such user to the Producer or distributor of the Picture shall be included in the Gross Receipts;

2.2.2.    In any territory where the Producer and/or distributor make an outright sale or license of the Picture to a person, firm or corporation under arrangements where the gross receipts of such person, firm or corporation may not be known to the Producer and/or distributor, any sums received by such person, firm or corporation shall not be included in the Gross Receipts, and only the sale price or license fee received by the Producer or distributor shall be included in the Gross Receipts;

2.2.3.    The amounts of any tariffs, import, export or sales taxes, imposts or duties, quota fees or

SCHEDULE I

Distribution fees for actual distribution services by the Producer or its affiliated distributor shall be the following percentages of the Gross Receipts:

I.   If the Motion Picture is released in any medium other than in the United States on television:

(a)   30% of Gross Receipts derived from the United States and Canada;

(b)   35% of Gross Receipts derived from the United Kingdom of Great Britain and Northern Ireland, the Republic of Ireland, the Isle of Man, the Channel Islands, Malta and Gibraltar; and

(c)   40% of Gross Receipts derived from all other countries.

II.   If the Motion Picture is released in the United States on television:

(a)   For any First National Exhibition of the Motion Picture, 10%. "First National Exhibition" means the first exhibition of the Motion Picture over a United States free commercial national television network.

(b)   From any Other National Exhibition of the Motion Pictures, 20%. "Other National Exhibition" means any exhibition of the Motion Picture over a United States free commercial national television network subsequent to its telecasting pursuant to a contract for a First National Exhibition, provided that the re-run of the Motion Picture on such a national television network pursuant to any agreement for a First National Exhibition shall be deemed to be a First National Exhibition.

(c)   From Non-Network Exhibition of the Motion Picture,- 35%. "Non-Network Exhibition" means any exhibition of the Motion Picture on United States free television, other than a First National Exhibition or any Other National Exhibition, or any exhibition of the Motion Picture on cable, pay cable, direct broadcast, or subscription television in the United States.