# EXHIBIT  D

**Greg Redlitz**

| | |
|---|---|
| **From:** | Ralph De Palma III <rdepalma@rdepalma.com> |
| **Sent:** | Monday, December 27, 2021 5:07 PM |
| **To:** | Robert Thorne; Greg Redlitz |
| **Cc:** | Shelley Reid |
| **Subject:** | Lonesome Dove Book Acquisition Agreement v1.0 122721 |
| **Attachments:** | Lonesome Dove Book Acquisition Agreement v1.0 RDP 122721 DRAFT.docx |

Hi Robert and Greg,

I hope all is well and that you had a great holiday weekend.

Shelley asked that I send you a draft of the purchase agreement, which I have attached.  As we discussed I will send you a notice of termination when we get to the point where this is a fully negotiated agreement.  As I said, the termination notice is not a complicated document, it merely follows the statutory format, names the agreements to be terminated, a termination date and the other items required by the regulations.  I only tell you that so that you can explain to your client that there is no surprise.  You will see much of that information is already contained in this agreement.

As my client's have not had the opportunity to review this draft of the agreement, I must reserve their right to comments and changes.

Best regards,
Ralph

RALPH G. DE PALMA III, ESQ. PC
c/o PRYOR CASHMAN LLP
7 Times Square, 40th floor
New York, NY 10036-6569
(212) 326-0195 phone
(732) 431-3460 cell
rdepalma@rdepalma.com

## ACQUISITION AGREEMENT

This will confirm the agreement (the "**Agreement**"), dated as of _____, by and between Halcyon Television, LLC ("**Purchaser**"), on the one hand, and Norma Faye Kesey ("**Kesey**") and James McMurtry ("**J. McMurtry**", and, individually and collectively with Kesey, "**Statutory Successor**"), and the Estate of Larry McMurtry ("**Estate**", and, individually and collectively with Statutory Successor, "**Owner**"), on the other hand, with respect to certain rights in and to the book entitled "Lonesome Dove", written by Larry McMurtry ("**McMurtry**"), United States copyright registration number TX0001585164, originally published in 1985 by Simon & Schuster ("**Book**") and any and all versions thereof including the title(s), themes, contents, dialogue, characters, settings, characterizations, elements, translations, adaptations of the Book (hereinafter collectively referred to as the "**Property**").

**WHEREAS**, on _____, Statutory Successor, as statutory successors in interest to McMurtry, issued to Purchaser, as statutory successor in interest to "Motown" and "RHIE" (as such parties are defined herein), a Notice of Termination pursuant to Section 203 of the Copyright Act notifying Purchaser of Statutory Successor's election to terminate on _____ (the "**Termination Date**") the grant or transfer of copyright in and to all motion picture rights, television rights (including all underlying rights to the motion pictures and television programs of all kinds, including subsequent motion pictures and television programs), and any related first negotiation and/or first or last refusal rights, in and to the Property, including the grants made in the following agreements (individually and collectively, the "**Statutory Rights**"): (i) that certain agreement dated as of March 18, 1985 ("**1985 Agreement**"), by and between McMurtry and Motown Productions ("**Motown**"), predecessor in interest to Purchaser, granting certain audio-visual and related rights in and to the Property, and pursuant to which the following television programs were produced and exploited: "Lonesome Dove" (1989 scripted television miniseries) ("**LD Miniseries**"), "Return to Lonesome Dove" (1993 scripted television miniseries) ("**RLD Miniseries**"), "Lonesome Dove: Making of an Epic, 1991 documentary television movie ("**LD Documentary**"), "Lonesome Dove: The Series" (1994-95 episodic television series) ("**Initial LD Series**"), and "Lonesome Dove: The Outlaw Years" (1995-96 episodic television series) ("**Second LD Series**"); (ii) that certain agreement dated as of March 18, 1991 between McMurtry and RHI Entertainment, Inc. ("**RHIE**"), predecessor in interest to Purchaser, which, among other things, amends and reaffirms certain provisions of the 1985 Agreement; (iii) that certain agreement dated as of August 20, 1993, by and between and McMurtry and Saria Productions ("**Saria**") for the services of McMurtry and Diana Ossana ("**Ossana**"), on the one hand, and RHIE, on the other hand, with respect to the 1995 scripted television miniseries entitled "Streets of Laredo" ("**SOL Miniseries**"), to the extent it amends certain provisions of the 1985 Agreement; and (iv) that certain agreement dated as of June 22, 1995, between McMurtry, Saria and Ossana, on the one hand, and RHIE, on the other hand, with respect to the 1996 scripted television miniseries entitled "Dead Man's Walk" ("**DMW Miniseries**"), to the extent it amends certain provisions of the 1985 Agreement (the LD Miniseries, RLD Miniseries, LD Documentary, Initial LD Series, Second LD Series, SOL Miniseries and DMW Miniseries are individually and collectively referred to herein as the "**Existing Derivative Works**");

**WHEREAS**, Statutory Successor and Purchaser, as the successors in interest to the Statutory Rights, have mutually agreed to renegotiate the Statutory Rights and to regrant them to Purchaser, and to its assigns and licensees, on the terms set forth in this Agreement in perpetuity in lieu of exercising and with the express waiver of any rights provided in Section 203, or in any other section, of the Copyright Act to terminate the prior grant of such rights; and

**WHEREAS**, the Estate and Statutory Successor wish to grant certain additional rights in and to the Property;

**NOW, THEREFOR**, for good and valuable consideration, the receipt, sufficiency and adequacy of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.      **CONDITIONS PRECEDENT**: All of Purchaser's obligations (but not Purchaser's rights) hereunder are subject to satisfaction of the following conditions precedent:

(a)     Signature by Owner (or publisher, as applicable) and delivery to Purchaser of this Agreement and the attached Assignment and Publisher's Release; and

(b)     Purchaser's receipt and approval of all chain-of-title documentation to the Property, including, without limitation, the Publisher's Release, in substantially the form attached hereto.

2.      **ACQUISITION**: Effective upon payment of the "Purchase Price" (as defined herein), Owner hereby automatically and irrevocably grants, conveys, assigns, transfers and sets over to Purchaser, and Purchaser hereby automatically and irrevocably owns and is vested with the following in perpetuity throughout the universe (the "**Rights**"):

(a)     Rights: the right to use, pitch, develop, produce, exhibit, distribute, subdistribute, license, sublicense, sell, assign, transfer, advertise, market, publicize, or otherwise exploit, in any language and/or format and in any and all media now known or hereafter devised, in perpetuity, directly or indirectly, through licensees, assignees, designees, or affiliates, any and all motion picture, television, remake and sequel, live stage, radio (including, without limitation, podcast), live television, merchandising, commercial tie-up and other allied rights of every kind and nature in and to the Property, including, without limitation, episodic television series, limited series, mini-series, motion pictures (theatrical or otherwise), interactive media, virtual reality, video games, merchandise, theme park, and all other ancillary rights, excluding only the "Reserved Rights" (as defined herein), in any language and/or format and in any and all media now known or hereafter devised (each, a "**Production**"), and all copyrights whether registered or unregistered, throughout the universe, and pending applications to register the same, trademarks, service marks and related rights, whether registered or unregistered, throughout the world, and pending applications to register same all national, state and common law registrations, applications for registration, renewals, extensions restorations and resuscitations of the foregoing, together with all goodwill symbolized by the foregoing, and all so-called "moral rights of authors" or "droit moral" rights (and/or any similar or analogous rights under any applicable Law of any jurisdiction) with respect to any of the foregoing, and the right to make such changes therein, and/or uses thereof, as the owner shall from time to time determine in its sole discretion, regardless of whether any such rights arise under the Laws of the United States or any other state, country or jurisdiction, and all rights and remedies against infringement or other violation thereof, exclusively throughout the universe and in perpetuity, free and clear of any and all lien (statutory or otherwise), claim, charge, security interest, mortgage, deed of trust, pledge, hypothecation, assignment, encumbrance, conditional sale or other title retention agreement, preference, priority or other security agreement or preferential arrangement of any kind.

(b)     Droit Moral: Purchaser shall have the right (to be exercised in its sole discretion) to adapt, modify, fictionalize, add to or take from the Property in connection with the Production, and to combine the same with any other literary or musical work. In this regard, Owner hereby waives the exercise of any provision of law known as "droit moral" or any similar law which may now or hereafter be recognized in any country or place, (including, without limitation, the so-called right of paternity [*droit a la paternite*], right of integrity [*droit au respect de l'oeuvre*], right of withdrawal [*droit de retrait* or *droit de repentir*] and/or right of publication [*droit divulgation*]) and agrees not to institute, support, maintain or permit any action or proceeding on the ground that any Production in any way constitutes an infringement of any of Owner's *droit moral* or is in any way a defamation or mutilation of the Property or any part thereof or contains unauthorized variations, alterations, modifications, changes or translations thereof.

(c)     Rental Right: Owner acknowledges that the compensation payable under this agreement includes adequate and equitable remuneration for the "Rental and Lending Rights" (as defined below) and constitutes a complete worldwide buyout of all Rental and Lending Rights, in perpetuity. Owner hereby irrevocably grants to Purchaser throughout the world in perpetuity, the right to collect and retain for Purchaser's own account all amounts payable to Owner in respect of Rental and Lending Rights and irrevocably directs any collecting societies or other persons or entities receiving such amounts to pay them to Purchaser. "**Rental and Lending Rights**" means all rights of Owner to authorize, prohibit, control or receive money (other than as provided in this agreement) from the rental, lending, fixation, reproduction of other exploitation of the materials, results and proceeds of Owner's services, or any motion picture, program or other production based thereon, by any media or means now known or hereafter devised as may be conferred upon Owner under

applicable laws, regulations or directives, in any jurisdiction throughout the world, including any so-called rental and lending rights pursuant to the European Community ("EC") directives or enabling or implementing legislation, laws or regulations enacted by member nations of the European Community. The payments made by Purchaser to Owner under this agreement are deemed to include sufficient remuneration for all so-called rental and lending rights pursuant to the EC directives, enabling or implementing legislation, laws and regulations enacted by the member nations of the EC.

(d)     Name, Likeness and Biography:  The right to use Owner's and McMurtry's name, likeness and biography in and in connection with the Production and in connection with the advertising, promotion, marketing and exploitation thereof; provided, however, that Owner's name, likeness and/or biography shall not be used to directly endorse any product or service.

(e)     No Obligation To Proceed:  Owner expressly agrees and acknowledges that nothing contained in this Agreement requires, nor shall be construed as requiring, Purchaser to exercise or exploit, or continue to exercise or exploit, any of the Rights herein granted.  Purchaser shall not be obligated actually to develop, produce, release, distribute or exploit a Production, or to continue the release and/or distribution of the Production in any country or territory if commenced.

3.     **RESERVED RIGHTS**:  Owner reserves the following rights (the "**Reserved Rights**") in the Property:

(a)     Print Editions:  All publishing rights in and to the Book, provided, however, that Purchaser shall have the customary right (for advertising and publicity purposes) to broadcast, prepare, publish and copyright publications in newspapers, magazines and periodicals of all types, any synopsis, excerpts, summaries, abridged and/or revised versions of the Book, resumes and stories (individually and collectively, "Synopses") of the Book, or any part thereof, for any motion picture version thereof, no one of which, however, shall exceed 7,500 words in length, and the rights to use said Synopses in programs, booklets, posters, lobby displays, pressbooks, trade publications, newspapers, magazines and other periodicals, commercial and other tie-ups, and all other media of advertising and publicity whatsoever (and to copyright said Synopses in Purchaser's name in all countries of the world).

(b)     Electronically Read Editions:  The right to publish the text of published print editions of the Book in the form of electronically read devices individually purchased by the end-user through any means, including the internet including digital and/or e-books and/or "enhanced electronic books", provided that such enhanced electronic version will not dramatize events described in the Book. Such electronically read editions may not contain visual images (other than the text, cover art, and illustrations as they appeared in the print version).

(c)     Books-on-Tape:  The right to publish non-dramatic audio recording versions of the Book (i.e., so-called "books-on-tape").

4.     **EXISTING DERIVATIVE WORKS**:  Owner and Purchaser hereby agree that all of Purchaser's rights and obligations with respect to the Existing Derivative Works are retained by Purchaser, and that Purchaser will have the unfettered irrevocable right to assign at any time any or all of Purchaser's rights and obligations with respect to the Existing Derivative Works.

5.     **PURCHASE PRICE**:  The purchase price of the Rights provided by Owner hereunder shall be Eight Hundred and Fifty Thousand United States Dollars (US$850,000) ("**Purchase Price**"), and will be payable upon satisfaction of all of the Conditions Precedent hereto.

6.     **CREDIT**:  In the event that Owner is not in breach or default hereunder, and subject to the restrictions and/or requirements of any applicable guild, network or distributor, if the Production is substantially based on the Property, Owner shall be accorded the following credit: (a) "Based on the book by Larry McMurtry" (if the title of the Production is the same as the title of the Book) or (b) "Based on the Book "Lonesome Dove" by Larry McMurtry  (if the title of the Production is not the same as the title of the Book), as follows:

3

(a)     On Screen.  On screen, on all positive prints of the Production, in the main title credits (wherever the main title credits shall appear), on a separate card; and

(b)     In Paid Advertising.  Subject to the standard exclusions and exceptions of the distributor(s) of the Picture, in the billing block portion of all paid advertising relating primarily to the Production issued by, or under the direct control of, Purchaser or the United States distributor in which the regular billing appears (i.e., billing block is where credit is accorded to the director, producer, writer, cast, etc.) (**"Paid Ads"**).

(c)     Excluded Ad Tie.  Owner's credit shall also appear in the billing block portion of all "Excluded Ads" (as defined herein) (other than award, congratulatory or nomination advertising in which the honoree(s) is/are the only individual(s) mentioned, group, special, or institutional advertising, film market or film festival advertising, teaser or radio advertising and/or the audio portion of TV ads) in which the screenwriter of the Production is accorded credit.

(d)     Exclusions and Exceptions.  Purchaser's Paid Ad credit obligations shall not apply to the following Paid Ads (hereinafter "**Excluded Ads**"): group, list, institutional or so-called teaser advertising; announcement advertising; advertising relating primarily to any member of the cast, the producer(s), writer(s) or any other personnel involved with the production of the Picture; so-called "award" or "congratulatory" advertisements, including advertisements or announcements relating to consideration or nomination for an award; trailers (including promotional films) or other screen, radio or television advertising; advertising in narrative form; advertising for film festivals, film markets and the like; advertising one-half page (or the equivalent in SAU's) in size or less; outdoor advertising (including, but not limited to so-called 24-sheets); theater display advertising; advertising in which no credit is accorded other than credit to one (1) or two (2) stars of the Production and/or to Purchaser and/or to any other company financing or distributing the Production.  The following shall not be considered Paid Ads or Excluded Ads for any purpose hereunder: videocassettes, videodiscs and other home video devices and the covers, packages, containers or jackets therefor; publicity and promotional items and materials; advertising relating to subsidiary or ancillary rights in the Production (including, but not limited to novelizations, screenplays or other publications, products, merchandising, music publishing or soundtrack recordings); voiceovers; advertising, publicity and exploitation relating to by-products or commercial tie-ins; and other advertising not relating primarily to the Production.

(e)     General Terms.  All other matters with respect to Owner's credit shall be determined by Purchaser in its sole discretion.  Any reference to the "title" of the Production shall be deemed to mean the "regular" title unless such reference is specifically made to the "artwork" title.  No casual or inadvertent failure to comply with the provisions of this Section nor any failure by third parties to comply with their agreements with Purchaser shall constitute a breach of this Agreement by Purchaser.

7.     **REPRESENTATIONS AND WARRANTIES**:  Owner represents, warrants and agrees that: (a) except as set forth in the initial (unnumbered) paragraph of this Agreement, the Property has not been published or registered for copyright in the United States or elsewhere but may be validly copyrighted or registered for copyright in the United States of America and likewise may be protected elsewhere so far as the laws of other places and countries provide for such protection; (b) the Property is wholly original with Owner (except for minor and incidental material from the public domain); (c) neither the Property, nor any part or element thereof: (i) to the best of Owner's knowledge infringes upon or violates the personal or property rights or any other rights of any person or entity (including, without limitation, the rights of copyright and trademark; or (ii) to the best of Owner's knowledge (or that which Owner should know in the exercise of reasonable diligence), contains any element or material which in any manner constitutes a libel, slander or other defamation of any person or entity or infringes upon or violates the right of privacy or publicity of any person or entity; (d) the Property, the Rights and all other rights and privileges granted or to be granted to Purchaser hereunder are and shall at all times be free and clear of any liens, claims, charges or encumbrances; (e) no claims, litigation or other proceedings have heretofore been asserted and/or brought and no claims, litigation or proceedings are pending or threatened relating to the Property, the Rights and/or to any of the other rights and privileges granted or to be granted to Purchaser hereunder; (f) Owner is the sole and exclusive owner of the Property, and is the sole and exclusive Owner (and/or has obtained all necessary licenses, permissions and/or assignments from all applicable third parties) of all of the Rights, and of all other rights and privileges granted or to be granted to

4

Purchaser hereunder and Owner has full right, power and authority to make and perform this Agreement without obtaining the consent or approval of any person or entity; (g) the Statutory Heirs own collectively and exclusively 100% of McMurtry's termination interest under the Copyright Act, (h) no part of the Property is in the public domain (except for minor and incidental material therein); (i) except as set forth in the preamble to this Agreement, Owner has not heretofore in any way exercised or disposed of the Rights or any part thereof, and without limiting the generality of the foregoing, except with respect to the Existing Derivative Works, the Property has not previously been performed, exploited or exhibited as a motion picture, television production, audio-visual production, play or other form, and no rights have been granted or licensed to any third party to do so (except as specifically set forth herein); (i) Owner has not done or omitted to do, nor will Owner do or omit to do, any act or thing which impairs, encumbers or diminishes Purchaser's full enjoyment of the Rights and all other rights and privileges granted and to be granted to Purchaser under this Agreement; and (j) Owner represents that Owner has not entered into any agreement (written or oral, implied or express) with any third party which relates to the Production or the production of the Production nor has Owner made any promises to any third party in connection with the Production or the production of the Production.

8.    **INDEMNITY**:

(a)    Owner will defend, indemnify, and hold harmless Purchaser, its parent, successors, licensees and assigns and their respective officers, agents and employees, from all third party liabilities, damages, costs, charges, reasonable outside attorneys' fees, recoveries, actions, judgments, penalties, expenses and other losses whatsoever which may be obtained against, imposed upon or suffered by Purchaser, its parent, successors, licensees and assigns arising from a breach of any of Owner's representations, warranties or agreements hereunder.

(b)    Purchaser shall defend, indemnify, and hold harmless Owner from and against any third party liabilities, damages, costs, charges, reasonable outside attorneys' fees, recoveries, actions, judgments, penalties, expenses and other losses whatsoever which may be obtained against, imposed upon or suffered by Owner arising from Purchaser's development, production, distribution and exploitation of the Production (and all rights therein), with respect to which Owner has no obligation to indemnify Purchaser hereunder. Purchaser shall not be required to indemnify Owner for any claims arising from Owner's tortious conduct.

9.    **ADDITIONAL DOCUMENTS**:   Owner shall execute and deliver any further and additional consistent documents which Purchaser may deem necessary to carry out and effectuate the purpose and intent of this Agreement. If Owner fails to so execute and deliver to Purchaser any such further documents required of Owner under this Agreement, then Owner hereby irrevocably appoints Purchaser as Owner's attorney-in-fact to execute such documents. Said appointment is coupled with an interest and shall be irrevocable.

10.    **ASSIGNMENT**:   Owner may not assign this Agreement nor any of Owner's rights or obligations hereunder and any attempted assignment will be deemed void *ab initio*. This Agreement and any and all of Purchaser's rights and obligations hereunder may be freely and irrevocably assigned at any time by Purchaser in whole or in part to any person, firm or corporation.

11.    **NOTICES**:   All notices must be in writing, and sent by messenger, courier, or email with written confirmation of complete delivery. All notices shall be effective upon written confirmation of receipt by the recipient. Until written notice from the respective recipient, notices shall be sent to the parties at the addresses below:

To Owner:

With a copy to:

To Purchaser:

With a copy to:

5

12.     **LIMITATION OF REMEDIES**:     Owner acknowledges that in the event of a breach of any of Purchaser's obligations under this Agreement, the damages (if any) caused to Owner thereby are not irreparable or otherwise sufficient to give rise to a right of injunctive or other equitable relief, and Owner's rights and remedies in the event of a breach of this Agreement by Purchaser shall be limited to the right, if any, to recover damages in an action at law and Owner shall not be entitled to restrict or interfere with Purchaser's right to produce, distribute, market or exploit any and all productions produced pursuant to this Agreement or contemplated herein (including, but not limited to, derivative works and the Existing Derivative Works) and the ancillary rights therein or to otherwise exploit or exercise any of the rights granted to Purchaser hereunder.

13.     **PUBLIC RIGHTS**:   Nothing contained in this Agreement shall be construed to be or operate in derogation or limitation of any rights to which Purchaser may be entitled as a member of the public if this Agreement were not in existence.

14.     **GOVERNING LAW**:   This Agreement shall be governed by the laws of the State of California applicable to agreements entered into and to be wholly performed therein and shall not be modified except by a written document executed by both parties hereto.  All disputes arising out of this Agreement shall be exclusively resolved and adjudicated in the federal and state courts in Los Angeles, California.  Each of the parties hereby submits to the exclusive jurisdiction and venue of said courts and waives its rights to have disputes arising out of this Agreement adjudicated in any other forum.

15.     **ARBITRATION**:   All disputes which may arise between the parties hereto under or with respect to this Agreement will be determined solely by arbitration in accordance with the rules of JAMS pursuant to the procedures hereinafter set forth.  The arbitration shall be held in Los Angeles County, California.  Such determination by the arbitrators or by the sole arbitrator, whatever the case may be, shall be final, binding and conclusive upon the parties hereto and shall be rendered in such form that it may be judicially confirmed under the laws of the State of California.

16.     **COMPLETE UNDERSTANDING**:   This Agreement sets forth the complete understanding between Owner and Purchaser with respect to the Property and all prior agreements have been merged herein, whether written or oral, and may not be modified except by a written instrument signed by the party to be charged. Owner acknowledges that no representation or promise not expressly contained in this Agreement has been made by Purchaser or any of its agents, employees or representatives.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original and all of which, when taken together shall constitute one and the same instrument.  This Agreement shall become binding and enforceable upon a party at such time as a counterpart has been signed and either deposited in the mail, or transmitted via or electronic copy (e.g., PDF) to the other parties hereto.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first written above.

HALCYON TELEVISION, LLC

_____
NORMA FAYE KESEY

By: _____
Its:_____

_____
JAMES MCMURTRY

ESTATE OF LARRY MCMURTRY

By: _____
Its: _____

6

## EXHIBIT A

## ASSIGNMENT

For good and valuable consideration, the receipt of which is hereby acknowledged, the undersigned, the ESTATE OF LARRY MCMURTRY, NORMA FAYE KESEY and JAMES MCMURTRY (individually and collectively, "**Assignor**"), sells, sets over, grants, transfers and assigns to Halcyon Television, LLC, its successors and assigns ("**Purchaser**"), forever and throughout the world, all motion picture, television, allied and ancillary rights, title and interest in and to that certain book entitled "Lonesome Dove", written by Larry McMurtry ("**McMurtry**"), originally published in 1985 by Simon & Schuster ("**Book**") and any and all versions thereof including the title(s), themes, contents, dialogue, characters, characterizations, elements, translations, adaptations of the Book (hereinafter collectively referred to as the "**Property**").

The Property includes, but is not limited to: (i) all contents; (ii) all past, present and future adaptations and versions; (iii) the title, characters and theme; and (iv) the copyright and all renewals and extensions of copyright.

This Assignment is executed in accordance with and is subject to the agreement (the "**Agreement**") between the Assignor and Purchaser dated as of _____ relating to the sale and assignment to Purchaser of the above-mentioned rights in the Property, which rights are more fully described in the Agreement.

IT WITNESS WHEREOF, the undersigned has executed this Assignment on the date indicated below.

Dated: _____


_____
NORMA FAYE KESEY
Social Security Number: _____


_____
JAMES MCMURTRY
Social Security Number: _____


ESTATE OF LARRY MCMURTRY


By: _____
Its: _____
EIN: _____

1

## NOTARY ACKNOWLEDGMENT

STATE OF _____ )

                                  ) ss.

COUNTY OF _____ )

On _____, _before me, _____.
                                          (Insert Name and Title of Officer; e.g. Jane Doe, Notary Public)

personally appeared _____.
                                    (Insert Name and Title of Signer)

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____

Signature of Notary                                                     [Notary Seal]

*ACTIVE 61912538v1*

**EXHIBIT B**

**PUBLISHER'S RELEASE**